## STATE *v.* FRANK SHAW.

### October Term, 1900.

Present: TAFT, C. J., TYLER, WATSON and STAFFORD, JJ.

Opinion filed February 9, 1901.

*Criminal law—Impaneling the jury*—In impaneling a jury to try a respondent charged with murder in the first degree it is proper for the court to excuse a juryman who testifies that he has conscientious scruples regarding the infliction of capital punishment, and that such scruples would affect him in the performance of his duties as a juryman. So held in the case of a juryman who also testified that he had formed and expressed an opinion as to the guilt or innocence of the respondent.

*Criminal law—Evidence to characterize flight*—When on the trial of one charged with crime his flight is shown as tending to prove guilt, it is proper to show the extent of the flight and such actions and doings of the respondent, when pursued, including resistance of known officers in attempting his arrest, as tend to characterize the flight.

*Criminal law—Evidence*—In the trial of a respondent, charged with murder in shooting a sheriff's assistant who, with the sheriff and other assistants, was pursuing him, it was proper to show that the respondent was an escaped prisoner as tending to show that the purpose of the pursuing party was to arrest the respondent and not to injure him.

*Criminal law—Homicide—Evidence of intent*—Upon the question of the intent with which a respondent on trial fired a fatal shot from a rifle at a sheriff's assistant, it was proper to show that the respondent had been confined in jail, and had escaped therefrom and had immediately thereafter armed himself with a rifle with which he fired and set out upon the flight in which he was overtaken when he fired. Such evidence tended to show that the respondent had reason to suppose that he would be pursued by officers of the law, and that he intended to use the rifle in resistance of arrest if overtaken.

*Evidence—Plan*—A plan may be rendered admissible in evidence by testimony other than that of its draftsman.

*Order of evidence—Evidence in rebuttal*—To corroborate his testimony that a sheriff's assistant fired upon him with a rifle, the respond-

ent introduced evidence tending to show that at the time of the claimed shooting such assistant held a rifle which had been loaned to him loaded, and that when afterwards it was returned to its owner it had been discharged. This made it proper for the state in rebuttal to introduce evidence tending to show that after it left the assistant's hands and before it was returned to its owner it was left in several different places and was in the hands of several different persons, since such evidence tended to show that the rifle may have been discharged before it was returned to its owner and yet not have been discharged by the sheriff's assistant to whom it was loaned.

*Respondent a witness—Cross examination*—The court may properly allow a respondent, testifying in his own behalf, to be cross-examined as to his whereabouts two years before the trial.

*Respondent a witness—Showing facts affecting his credit*—On a trial for murder in which the respondent was a witness in his own behalf the fact was elicited from him in cross-examination that about two years before he had pleaded guilty to an assault. This fact was material to be considered in determining the weight of his testimony. The mode of its proof was not here in question.

*Arrest by officer of suspected felon*—A sheriff is justified, without a warrant, in pursuing and arresting one whom he has reasonable cause to suspect of the commission of a felony.

*Breaking jail is felony—V. S. 5094, 5166*—Breaking jail by a person lawfully imprisoned therein for any cause whatsoever is a felony at common law and by statute.

*Docket entries as record evidence*—The docket entries of a county court are in that court proper record evidence of what they show, import absolute verity, and are not subject to contradiction.

*Construction of docket entries—Presumption of regularity*—A docket entry showing that the bail of a respondent, charged with felony, was fixed by the county court before which a *capias* commanded him to be brought, imports that the respondent was before the court at the time the bail was fixed.

*Commitment on capias*—Although a *capias* only commands the sheriff to arrest the respondent named therein and forthwith have him before the court, the respondent after arrest remains in the custody of the sheriff until he has bail, and if he have no bail, the sheriff may commit him to jail upon the *capias*.

*State v. Lamoine, 53 Vt. 568*—The *obiter dictum* in *State v. Lamoine,* 53 Vt. 568, is disapproved.

*Respondent surrendered in discharge of bail—Intendment of law as to order of custody—When V. S. 2028 and 2029 are inapplicable*—The surrender of a respondent in discharge of his bail in a court of record of general jurisdiction, and a docket entry of such proceeding made under the direction of the court, carry with them, in the intendment of the law, authority from the court to its officer, to have the respondent in custody, and if he has not new bail to commit him to jail. The provisions of V. S. 2028 and 2029 have no application when a respondent is surrendered in court in discharge of bail without a bail warrant as provided in those sections, nor when a respondent surrenders himself in court and procures the discharge of his bail, nor when, in the discretion of the court, a person on trial for felony is ordered into custody in accordance with V. S. 1981.

*Construction of statutes—V. S. 1702, 1704, 1862*—Neither the statutes as to furnishing copies of the process on which a prisoner is committed to jail, nor any other statutory provisions, take away or abridge the right of arrest and commitment without warrant, or the right of commitment under the authority of a court of general jurisdiction without a mittimus. The rules of the common law are not to be changed by doubtful implication.

*Notice of character in which sheriff's assistant is acting*—When the attending circumstances make it clear to one sought to be arrested that a person is assisting and acting under a sheriff in attempting to make the arrest, such circumstances are the equivalent of express notice of the capacity in which such assistant is acting.

*Sheriff and assistant alike protected*—One acting with and under a sheriff in making an arrest has the same protection under the law as the sheriff himself.

*Homicide—Murder or manslaughter*—In determining whether a homicide is murder or manslaughter, a proper attempt at a lawful arrest cannot be considered a provocation to passion and heat of blood.

*Homicide—When doctrine of self-defence is inapplicable*—The doctrine of the right of self-defence has no application to resistance of a lawful arrest properly attempted.

*Murder in resisting arrest—Express malice immaterial*—If resistance to authorized arrest which is properly being made results in the death of the arresting officer the crime is murder, regardless of the question of malice.

*Deliberations of the jury—Use of exhibits*—The matter of allowing exhibits to go to the jury room is within the discretion of the court.

INDICTMENT FOR MURDER. Trial by jury, Windsor County, June Term, 1900, *Munson, J.,* presiding. Verdict guilty of murder in the first degree. The respondent excepted. Judgment and sentence respited and cause passed to the Supreme Court.

It appeared that the respondent, Frank Shaw, and his father, Dustin Shaw, were confined in Windsor County jail on the 24th day of April, 1900, and for some time previous thereto; that between dusk in the evening of the 23d of April and daylight of the 24th of April they left the said jail by an upper window thereof. The evidence on the part of the State tended to show that they were overtaken by Sheriff Spafford, of Windsor County, and several assistants, on the morning of April 27th, in a pasture in Stockbridge, and were by the sheriff called upon to surrender; that the respondent fired his rifle at George W. Hoffman, a deputy of Sheriff Spafford and one of his said assistants; that said Hoffman was struck by the shot fired, and died from the effects thereof the same day.

After the shooting of Hoffman the respondent and his father again fled, and on trial the state gave in evidence the circumstances of the flight and pursuit of the respondent to the time of his arrest, which was made near Middlebury by Sheriff Chapman of Addison County. The exceptions relied upon related to the ruling of the court in excusing a juryman, James E. Hurd, to the admission of evidence, to the denial of requests to charge, to the charge as given upon certain points and to a ruling permitting certain exhibits to go to the jury room. The nature of these exceptions fully appears from the opinion.

*John G. Sargent,* State's Attorney, and *William B. C. Stickney* for the State.

*Gilbert A. Davis* (assigned) for the respondent.

WATSON, J.  Exception 2 is without avail.  The juror testified, in effect, that he had read statements of the facts of the case in the newspapers, from which he had formed and expressed an opinion concerning the respondent's guilt or innocence, and still had that opinion.  He further testified that he had conscientious scruples regarding the infliction of capital punishment, and that such scruples would affect him in the performance of his duties as a juryman.  The respondent being charged with murder in the first degree, and the law being such that capital punishment would be inflicted, if he should be found guilty of that offense, it was due to the State that no person should be permitted to sit in the trial, as a juror, who could not, because of such scruples, determine the guilt or innocence of the respondent upon the evidence and law without being hampered by a prejudice against the penalty fixed by law, a prejudice which might be so strong as to prevent an agreement of murder in the first degree, regardless of the conclusiveness of the evidence tending so to show.  The State, as well as a respondent, is entitled to a jury that will determine the case upon the law and the evidence, and a true verdict give, without being controlled by such scruples as tend to thwart justice.  In excusing the juror, the discretion of the court was properly exercised, and no rights of the respondent were invaded or prejudiced thereby: *Quinn* v. *Halbert,* 57 Vt. 178. The number of peremptory challenges to which the respondent was entitled is fixed by statute, and additional like challenges could not be had by him as a matter of law.

Exceptions 7, 8, and 12.  Subject to respondent's exception, the State was permitted to show all that occurred after the homicide in respect to the flight and pursuit of the respondent to the time of his arrest near Middlebury.  It is well settled that evidence tending to show flight of a respondent immediately after the commission of the alleged offense with

which he stands charged, is admissible, and, unexplained, tends to show guilt. As the probative force of such testimony may be lessened or wholly taken away by evidence on the part of a respondent tending to explain such flight upon some theory other than that of guilt of the crime charged, it is proper to show the extent of the flight, together with the actions and the doings of the respondent that tend to characterize it, including resistance of known officers in attempting his arrest; for such actions and doings on the one hand may satisfactorily explain the flight upon the theory of innocence, while on the other hand, they may place it beyond explanation upon any theory other than that of guilt. These exceptions were not well taken: Will's Cir. Ev. 130-137; *State* v. *Chase,* 68 Vt. 405.

Exceptions 9, 10. The evidence showing the imprisonment of the respondent and his father in the jail at Woodstock, and their escape therefrom, was admissible as tending to show the reason why the sheriff of the county and his assistants were in pursuit of them at the time of the homicide, and as tending to show that the purpose of the pursuing party was to apprehend and not to injure them. It was also admissible upon the question of the respondent's intent when he fired the fatal shot. If he was confined in jail and escaped therefrom, and immediately upon such escape, armed himself with a rifle to carry in his flight, such evidence had a strong tendency to show that the respondent intended therewith to resist the officers of the law in case he was pursued by them, as he had reason to suppose he would be: *State* v. *Taylor & O'Donald,* 70 Vt. 1.

Exception 11. The witness Charles Batchelder, a surveyor, was permitted to testify that after the homicide certain places were pointed out to him by Spafford, as the places where Sheriff Spafford stood, where Hoffman stood, and where the respondent stood, at the time of the homicide, and that the wit-

ness made measurements relative to them, and a plan showing the relative locations of those places, and their distances from each other. The plan was objected to by the respondent, because the places indicated thereon were places shown the surveyor by other persons. Spafford was improved by the State as a witness and gave testimony of the surroundings and the positions of the respective persons at the time of the homicide, and testified also that later, at the place of the homicide, he pointed out these positions to the witness Batchelder. The latter was not present at the time of the homicide, and it became necessary for some one who was present and had knowledge thereof to point out to him the location of the respective persons, that he might make the proper measurements, and place the locations with accuracy upon his plan. This is the only way it could be done, and the plan was properly admitted in evidence.

Exception 15. The evidence of the State tended to show that when the sheriff and his assistant Hoffman came upon the escaped prisoners, the latter seized their rifles and brought them to their shoulders, the father aiming at the sheriff, and the respondent, at Hoffman; that thereupon, the sheriff called upon them to surrender, and said to them, in substance, that there must be no shooting, to which the respondent's father answered in the same way, and lowered his rifle; that the respondent did not lower his rifle, but continued to hold it aimed at Hoffman, whereupon Hoffman said to the respondent, "Frank, lower that gun or I will bore you;" repeating "Drop that gun, I tell you;" that then the respondent fired and Hoffman fell. The respondent testified to seeing and recognizing Spafford before any shot was fired, to knowing that he was the sheriff, to understanding that he was there to arrest the respondent for breaking jail, to hearing the voice ordering him to drop his gun, but to not seeing Hoffman. The respondent's

evidence tended to show that Hoffman had a rifle and fired it at the respondent—the bullet whizzing past his face—who, in the excitement of the moment, unintentionally discharged his rifle, and Hoffman was hit. The State's evidence tended to show that when Hoffman's rifle was picked up, it had not been discharged. This rifle had been borrowed by Hoffman of one Dr. Stevens, to whom, some days later, it was returned. Improved by the respondent as a witness, Dr. Stevens testified, in substance, that the rifle was a magazine-loader, and was loaded with fifteen cartridges when he lent it to Hoffman, and that when it was returned to the witness, the rifle was foul and bore evidence of having been fired several times. To meet this testimony, the State was permitted to show in rebuttal, subject to exception, that the rifle was in the hands of several different persons and left in different places between the time it was picked up, after the homicide, and the time when it was returned to its owner. This evidence tended to show that the rifle may have been foul when it was returned to Dr. Stevens, and yet not have been discharged by Hoffman. Therefore it was legally admissible in rebuttal.

Exception 16. The respondent took the stand and testified in his own behalf. In cross-examination, he was asked if he was in the town of Kingsbury, New York, in June, 1897, and subject to exception, answered not to his knowledge, and that he did not know where the town of Kingsbury is. Not only was this question proper for the purpose of showing the whereabouts of the respondent, but the answer was harmless. The respondent was then asked whether on the 22nd day of June, 1897, he was before Jesse Waitman, a justice of the peace, to answer to the charge of assault, and he answered that he was. He was then asked, "And to that, did you plead guilty?" The respondent objected to this question on the ground that it was immaterial. The witness was allowed to

answer it subject to exception, and answered that he did. The mode of the proof is not in question. The objection was confined to its materiality. The evidence had a material bearing on the respondent's present character and moral principles as a witness, and was properly received in the discretion of the court, to be considered by the jury in determining the weight to be given to the respondent's testimony: *State* v. *Slack and Clough,* 69 Vt. 486.

The respondent's counsel submitted a large number of requests to charge, and excepted to the refusal of the court to comply with each request; but in his argument before this court, the counsel relied upon and urged error in the non-compliance of the court with the first seven only.

The reporter's transcript of the whole case is referred to in the exceptions, that a full understanding of these requests and the exceptions taken to the charge may be had. The case shows that while the respondent and his father, Dustin Shaw, were under confinement in Windsor County jail, and between dusk of the evening of the 23rd day of April, 1900, and daylight on the following morning, they broke jail; that as soon as the telephone office was open, the deputy jailer notified the sheriff of the county, Mr. Spafford, of what had happened, and Spafford went by the eight o'clock train to Woodstock, and thence, he and the deputy jailer started in pursuit of the escaped prisoners. This was on Tuesday, and pursuit was made on each successive day thereafter until Friday, when Sheriff Spafford, with one of his deputies, Geo. W. Hoffman, who had been summoned by the sheriff to assist him in the pursuit, came upon the escaped prisoners in a pasture in the town of Stockbridge, where the homicide was committed. On January 20, 1900, an information charging the respondent and his father with unlawfully killing deer, was filed in Windsor County Court; they were arrested on a *capias* issued thereon; bail was

fixed by the Court, and on February 10th, they were released on bail. On February 22nd, they were surrendered in court, and the bail was discharged, whereupon they were committed to jail by the sheriff, or his deputy, without any mittimus therefor. On February 21st, an information, charging them with burglary, was filed in the same court, a *capias* was issued and they were arrested thereon, their bail was fixed by the court, and for want of bail, they were committed to jail on the *capias*. Thus, for want of bail in the two cases, the respondent and his father were in jail at the time of their escape therefrom.

It is argued that the respondent and his father were illegally imprisoned, and that in breaking jail, they were guilty of no criminal offense under the law, by reason whereof neither the sheriff nor his deputy Hoffman had any right to pursue and arrest them without a warrant therefor. But the right thus to pursue and arrest the escaped prisoners without warrant did not necessarily depend upon the legality of the imprisonment. By common law, a sheriff is *ex-officio* a conservator of the peace, and is not only permitted, but required, to take a felon, and if he omits his duty, he is indictable and subject to fine and imprisonment. Herein it is not material whether the sheriff see the felony committed, or, by complaint or information, have reasonable cause to suspect that a felony has been committed; for as well in one case as in the other, he is bound to apprehend the felon and to that end to make search after him within the limits of his jurisdiction and to raise hue and cry upon him: 2 Hale's P. C., 85, 91. A sheriff, too, is justified in pursuing and arresting suspected felons of his own accord, without any warrant, even though it should afterwards appear that no felony has been committed: *Samuel* v. *Paine,* 1 Doug., 358; *Beckwith* v. *Philby,* 6 Barn. & Cres., 635; *Davis* v. *Russell,* 5 Bing., 354; *Rohan* v. *Sawin,* 5 Cush., 381; *State* v. *Taylor & O'Donald,* 70 Vt. 1.

The test therefore is, did the sheriff have reasonable cause to suspect that a felony had been committed by the respondent and his father?   If the facts, which are supposed to constitute the probable cause, are found by the jury, or if there is no dispute in the evidence showing such facts, as in the case at bar, the question of probable cause is one of law and for the court: *Davis* v. *Russell,* 5 Bing., 354; *Perry* v. *Soulien,* 92 Mich., 72; *White* v. *McQueen,* 96 Mich., 249.

Breaking jail by a person lawfully imprisoned therein, for any cause whatsoever, whether criminal or civil, is a felony at common law—2 Hawkins' P. C., 183—and such it is by the laws of this State: V. S. 5094, 5166.

It has been the common practice in the County Courts of this State, when a respondent is brought into court on a *capias* issued on an information or indictment, if he have no bail, that he be committed to jail on the *capias;* and for the sheriff to take charge of respondents delivered in court in discharge of bail, and if they have not fresh bail, to commit them to jail without any mittimus or express order of the court for that purpose.   The commitments of the respondent and his father in the burglary case and in the deer killing case were in accordance with this practice; and the sheriff, upon receiving the information by telephone from the deputy jailer that they had broken jail, with the further information received by him at Woodstock relative thereto, and of their flight, had reasonable cause to suspect that a felony had been committed by them, and in such circumstances the law made it his duty to pursue and arrest the supposed felons at once, because he could not determine whether, in point of law, they were guilty of breaking jail or not until they were brought to trial which could not be until they are apprehended: 2 Hale's P. C., 93; *Cowles* v. *Dunbar,* 2 Car. & P., 565.

As it was the duty of the sheriff to pursue and arrest the escaped prisoners,—for he had reasonable cause to suspect they had committed a felony,—the fact whether they were legally confined in jail became immaterial, and the first, third, and seventh requests were unsound in principle and properly refused. However, on the exception to the refusal of the court to charge according to the second, fourth, fifth and sixth requests, the legality of the commitments of the respondent and his father, without mittimus, is before us for determination. Beyond the bearing of this question in the case at bar, in view of the practice in this State of committing respondents to jail upon a *capias* for want of bail, and without mittimus when surrendered in court in discharge of bail, the question is far reaching, of much inportance, and requires careful consideration.

By the terms of the *capias* issued in the burglary case, the officer was commanded to take the bodies of the respondent and his father, and them forthwith have before the County Court then in session at Woodstock, to answer to the information, and to do and receive what should be considered and adjudged by the court in the premises; but it is said that they were at once committed to jail without being taken before the court, as commanded by the *capias,* and thus there remained until their escape therefrom. The docket entries were introduced in evidence to show what had been done by the court in that action. This was proper evidence,—*Armstrong* v. *Colby,* 47 Vt. 359,—and it appeared therefrom that the respondent's bail was fixed by the court, an act which carries with it, by intendment, the fact that the respondent was then before the court; for the bail of a respondent charged with felony, unless there can be a waiver upon his part, a question upon which we give no intimation, cannot properly be fixed in his absence. The record imported absolute verity, and was not subject to contradiction: *Masseaux* v. *Brigham,* 19 Vt. 457; *Farr* v. *Ladd,* 37 Vt. 156.

In *Armstrong* v. *Colby,* 47 Vt. 359, the effect of a verdict upon which no judgment in express terms was shown to have been rendered, was under consideration.    The docket entries showed a verdict, also exceptions allowed, and execution stayed. The court said that there could be no execution to be stayed without a judgment, and therefore, the docket entries showed a verdict and judgment thereon; and that in some of the County Courts of the State, the practice had been to make no formal entry of judgment on verdicts, but to treat all verdicts left to stand as having judgment rendered thereon, and to have the records made up accordingly.    See also *People* v. *Nevins,* 1 Hill, 154.

It is argued that when the officer had brought the respondent and his father before the court, the force of the *capias* was exhausted, and they could be committed to jail only upon a mittimus issued for that purpose.    Notwithstanding a *capias* only commands the sheriff to arrest the respondent named therein, and forthwith have him before the court, the respondent remains in the custody of the sheriff by virtue of the *capias* until he has bail, and if he have no bail, the law makes it the duty of the sheriff to commit him to jail, and this he may do upon the *capias;* and when a respondent is thus committed for want of bail, it is proper for the sheriff to state that fact in his return.

In 2 Hawk. P. C. 174, s. 1, it is said,—"There is no doubt but that persons apprehended for offenses which are not bailable, and also all persons who neglect to offer bail for offenses, which are bailable, must be committed;" and in 2 Hale's P. C. 123,—"If the prisoner be bailable, yet the justice is not bound to demand bail, but the prisoner is bound to tender it, otherwise the justice may commit him; and so of a sheriff that hath taken a man by *capias,* where he is bailable;" and in Vol. I, 610, in

speaking of the crime of breaking prison, it is further said,— "But if B be indicted or appealed, and taken by *capias,* and committed, and break prison, there needs no averment or proof that a felony was done, but only that there was an indictment or appeal, and a *capias* thereupon, because all appears by matter of record;" and Lord Coke, in discussing the same subject said,— "Imprisonment is a restraint of a man's liberty under the custody of another by lawful warrant in deed or in law. Lawful warrant is, when the offense appeareth by matter of record, or when it doth not appear by matter of record. By matter of record, as when the party is taken upon an indictment at the suit of the King, or upon an appeal at the suit of the party. When it doth not appear by matter of record, as when a felony is done, and the offender by a lawful mittimus is committed to the jail for the same. But between these two, there is great diversity: For in the first case, whether any felony were committed or no, if the offender be taken by force of a *capias,* the warrant is lawful; and if he break prison, it is felony, albeit no felony were committed. But in the other case, if no felony be done at all, and yet he is committed to prison for a supposed felony, and break prison, this is no felony, for there is no cause: 2 Co. Inst. 590.

The case of *State* v. *Lamoine,* 53 Vt. 568, is relied on by the respondent as authority that when the respondent and his father were brought into court on the *capias* in the burglary case, and failed to procure bail, their commitment could be only by order of court and on a mittimus issued for that purpose; but in *Kent* v. *Miles,* 68 Vt. 48, that case is criticised, the court saying that in the disposition of the case, it was not necessary to call in question the sufficiency of the warrant. It will be seen on examination of *State* v. *Lamoine,* that what is there said in the opinion and here relied upon by the respondent

as authority supporting his contention, are mere *obiter dicta* with no force as a judicial determination.

It is also argued in behalf of the respondent that, when he and his father were surrendered in court in dischar·e of bail, and had not fresh bail, they could then be committed to jail only upon a mittimus issued for that purpose. · Had they been surrendered in discharge of their bail in a court of limited jurisdiction and not of record, this contention would have more force; but since that question is not now before us, we express no opinion whether it would be necessary to issue a mittimus, or whether a commitment could be made upon the original warrant. In the case at bar, they were surrendered in discharge of their bail in a court of record and of general jurisdiction, and there would seem to be no doubt as to the law upon that question. In Hale's Pleas of the Crown, 583-584, in speaking of what is to be done after the warrant is served, and the person accused is brought before the justice thereupon, it is said, "If the accused be bailable, he may bail him. If he have no bail, or the case appears not to be bailable, he must commit him. And being either bailed or committed, he is not to be discharged till he be convicted or acquitted or delivered by proclamation. And this leads me to the mittimus or the warrant of the jailer to receive him; and this is the ground of the felony in case of a breach of prison. My Lord Coke, 2 Inst. 591, makes three essential parts of the mittimus: First, that it be in writing, sealed by the justice that commits, and without this part, the commitment is unlawful, the jailer is liable to a false imprisonment, and the wilful escape by the jailer, or breach of prison by the prisoner, makes no felony. But this must not be intended of a commitment in a court of record, as the King's Bench, Jail Delivery, or Sessions of the Peace, for there the record itself, or the memorial thereof which may at any time be entered of record, are a sufficient warrant without any war-

rant under seal." It is also said in 1 Backus, 150,—"Though a commitment by a magistrate ought to be under his hand and seal, yet a commitment by a court of record, without such warrant, is sufficient, for the record itself or the memorial thereof, which may at any time be entered of record, will protect the jailer from false imprisonment for which he is liable for an unlawful detention." Such is the law as laid down in 3 Co. Inst. Cap. 100, and in 1 Burn's Just. (22 Ed.), 604. In *Ex Parte* Whitchurch, 1 Atk. 55, an order that Whitchurch should stand committed was under consideration, and it was held by Lord Hardwicke, that if the man had been present in court when the order was pronounced, he was instantly a prisoner, and the warden might have taken him away to jail directly. In *King* v. *Clarke,* 1 Salk. 349, upon a return in *habeas corpus* proceedings, it was resolved that where a commitment was in court to a proper officer present, there was no warrant of commitment, and therefore, a warrant could not be returned in *haec verba,* but the truth of the whole matter must be returned under peril of the action. In Bethel's case, 5 Mod. 19, the return to a *habeas corpus* showed that the prisoner was committed to the custody of the jailer by virtue of an order of the Court of Sessions that he pay a fine of one thousand pounds, and that he remain in the custody of the jailer until, etc. The jailer did not have the custody of the prisoner until the commitment was made on this order. It was held by Lord Chief Justice Holt that although the order should have been that the prisoner be committed—for he could not remain in such custody unless their had been a commitment—the order was sufficient, and the prisoner was remanded.

In *State* v. *Heathman, Wright,* (Ohio), 690, the defendant was brought before a justice on a complaint under the bastardy act, and duly recognized to appear in the Court of Common Pleas to answer the complaint and abide the order of

the court thereon. He was found guilty and the court ordered, among other things, that he stand committed until the order for payment, etc., be complied with. Under this order he was imprisoned until he swore out of jail, but there was no mittimus given to the sheriff. The court said, "The record of the Common Pleas shows the order to commit made in open court. In such cases a mittimus is not necessary,— the order of the court to the sheriff is his authority, and the evidence of it being preserved on record, no writ or copy of the order was necessary." See also *People* v. *Nevins, supra.*

The "memorial" referred to in some of the above named authorities means in law a short note, abstract, memorandum, or rough draft of the orders of court from which the records thereof may at any time be fully made; and the docket entries may well answer thereto. The docket entries in the deer killing case show that the respondent and his father were surrendered in court in discharge of their bail; but it does not appear therefrom that they were, in fact, ordered into the custody of the sheriff, nor that their commitment was expressly ordered by the court, nor that any mittimus was issued. However, for these to appear, in fact, is not essential to their legal commitment to jail. The sheriff is the officer of the court, and when a person charged with crime is surrendered in court in discharge of his bail, if he have not fresh bail, he is then, by operation of law, and without any general or special order of the court, in the custody of the sheriff, whose duty it is to take charge of persons before the court accused of crime. Otherwise, when a respondent is thus delivered in court, he is in the custody of no one, and is at liberty to go whither he will. In this regard there would seem to be no difference between a person surrendered in court in discharge of his bail and one put upon trial for a criminal offense; and in the latter case, at common law, (though modified by statute, V. S. 1981),

he was, by operation of law, committed to the custody of the sheriff, and there was no necessity for either a general or special order mandatory to that officer. From that moment, the accused was in legal custody, and the sheriff as executive officer was charged with his safe keeping: *Hodges* v. *State,* 8 Ala. 55. The question then arises, Is it necessary in such circumstances for the court to make an express order of commitment for want of bail? As has been seen in Hale's and in Hawkins' Pleas of the Crown, the law requires that in a case not bailable, or if the respondent fails to procure bail, he shall be committed to jail; and in practice, it has never been deemed necessary for the court to make an express order that a respondent be committed to jail for want of bail. Unless an order for that purpose is expressly given in a particular case, the sheriff acts under the law and a general continuing order of the court to that effect, and there is no good reason why such practice may not obtain; nor is there any substantial reason why, when the respondent is thus in custody, the sheriff should not commit him to jail, as the law requires, under such general continuing order, without waiting for an express order in each particular case. In *Re Durant,* 60 Vt. 173, the relator was imprisoned in the common jail upon a warrant issued by the clerk of the court in vacation, and it was contended by the relator that the clerk had no authority for the issuing of such warrant. This brought into consideration the construction of section 819, Revised Laws, relative to the duty of clerks, which provides, among other things, that the clerk shall "record any other proceedings that the court may direct and make and sign all process regularly issued from either of the courts aforesaid under the direction of the judges"; and it was said by the relator that the clerk could issue no process except as expressly directed by the judges. The court said, "This is against the practical construction which this statute has re-

ceived.   Neither courts nor judges have been in the habit of
expressly ordering clerks to make, sign and deliver to prose-
cuting officers or sheriffs, warrants for the apprehension of
persons indicted, but they have been issued by the clerks as an
authorized duty in regular course, without express direction.
* * *   The warrant for the arrest is the process regularly
issued upon the indictment.   The clause 'under the direction
of the judges' confers upon them the right to make orders, the
right of supervision, but does not require an express order to
invest the clerk with authority to issue a warrant for arrest in
due course.   The Statute requires clerks to make and keep
dockets of causes pending, etc. and also 'to record any other
proceedings that the court may direct.'   And the practice is
for clerks to make a docket entry of each order of the court in
a cause, and for courts to so direct; but I apprehend no clerk's
docket in the state shows an entry of an order to issue warrants
for arrest on indictment.   The practice is the same in issuing
executions in civil causes and mittimuses in criminal causes.
They are issued at the hand of the clerk and usually, when
regularly issued, without express order or docket entry of such
order.   The rendition and entry of the judgment on the docket
has always been regarded as carrying with it all the authority
which is required from the court to the clerk to issue such reg-
ular official processes as the judgment warrants." In the same
manner, the surrender of a respondent in court in discharge of
his bail, and the entry of the order to that effect upon the docket
by the direction of the court, may be regarded as carrying with
them, in the intendment of law, all of the authority which is
required from the court to the sheriff to have the respondent
in custody, and if he have no bail, to commit him to jail as the
law requires.

Lord Coke in discussing the rights and personal liberties
guaranteed by the provisions of Magna Charta said that pro-

cess of law was two-fold, namely, by the King's writ, or by due proceeding, and warrant either in deed or in law without writ; that if treason or felony be done, any man, against whom there is just cause of suspicion, may be, by a warrant in law, attached and imprisoned by the law of the land; and "that a commitment by lawful warrant, either in deed or in law, is accounted in law due process or proceeding in law, and by the law of the land, as well as by process by force of the King's writ:" 2 Co. Inst. 51-52.   By examination of the context, the meaning of the words "commitment by lawful warrant, either in deed or in law" is unmistakable.   A commitment by lawful warrant in deed means by warrant in writing and under seal, but a commitment by lawful warrant in law is a commitment by force of law or by authority of law without a written warrant.   Such is the construction given in *People* v. *Nevins, supra.*

It therefore becomes necessary to examine the statutory provisions relied upon by the respondent to see whether the common law, in the regards above indicated, has been affected thereby.   It is provided by section 1702, V. S. that an officer committing a prisoner shall deliver him to the keeper of the jail, within the same, and give the keeper an attested copy of the process on which the commitment is made with his return thereon; by section 1862, that when a prisoner is committed to jail on a criminal process, the commitment shall be in the manner prescribed for commitments on civil process; and by section 1704, an officer who does not within six hours deliver a true copy of the warrant or process by which he detains a prisoner to a person who demands such copy, and tenders the fees therefor, shall forfeit to such prisoner $200.   It is contended by the respondent's counsel that these sections show conclusively that a prisoner can be committed to jail only upon a written warrant or written process, for otherwise, an attested

copy of the warrant or process could not be delivered to the jailer, nor a true copy of the same given to a person who demands it, as provided in the latter section.  While it is true that an attested copy of the warrant or process cannot be delivered to the jailer, nor a true copy of the same delivered to a person upon demand, unless there is such warrant or process, is it true that all authority to arrest without warrant, as it exists at common law, has, by implication, been taken away by these provisions of the statute? At common law, when treason or felony is committed, it is lawful for any man, who has reasonable cause to suspect that a person is guilty of the crime, to apprehend him, and the sheriff or constable is bound by law to apprehend the felon under the penalty of fine and imprisonment.   So it is of hue and cry,—anyone may arrest the suspected person; a person about to commit the crime of felony may be arrested to prevent the crime; a watchman may arrest a night walker; if a man woundeth another dangerously, he may be arrested; if a man keep the company of a notorious thief, whereby he is suspected, it is good cause for his arrest; if an affray be made to the breach of the peace, any man viewing it may arrest any of the offenders; and in all such instances, as well as in others not mentioned, the arrest may be made without warrant.   It was held in *State v. Taylor & O'Donald, supra,* that an officer, having reasonable cause to believe that a person has committed a felony in another state, may arrest him here without warrant, and that the same right to arrest exists in such case as exists in the case of local offenders.   Yet to give the statutory provisions under consideration a construction in accordance with the respondent's contention, would take away all authority to make such arrests without warrant; for the right to commit to jail follows the right to arrest, with the limitation however that the officer should, as soon as circumstances will reasonably permit, bring his pris-

oner before a proper magistrate for a preliminary examination.

It is said in 2 Hawk. P. C. 174, s. 3, that "It seems to be agreed by all the old books that wheresoever a constable or private person may justify the arresting another for felony or treason, he may also justify the sending or bringing him to the common jail, and that every private person has as much authority in cases of this kind as a sheriff or any other officer, and may justify such imprisonment by his own authority, but not by the command of another." See also Hale's P. C. 81; 1 Chitty Cr. L. 20-24; and *Beckwith* v. *Philby,* 6 Barn. & Cres. 635. In *Commonwealth* v. *Deacon,* 8 S. & R. 47, the respondent, a jailer, was charged with refusing to receive into his custody one Canfire who was arrested, by a constable, for committing a breach of the peace in his presence. A trial was had, with a verdict of "guilty," subject to the opinion of the court whether the offense was indictable. The court said:—"Although the authorities are not decisive on this subject, they go a considerable length to establish the rights of a constable to deposit a prisoner arrested without warrant in the common jail for safe keeping till he can be carried before a magistrate. Even a private person, who may have apprehended another for treason or felony, may convey him to the jail of the county; although it is said the safer course is to cause him, as soon as convenience will permit, to be brought before a justice of the peace, and I cannot see any reason why a private person should not have the same authority on an arrest during an affray which has taken place in his presence. A constable may put a party arrested for an affray in the stocks; and in case of any offense for which the party suspected may be arrested, may convey him to the sheriff or jailer of the county; although in this case also, and in every other of the kind, it is said to be the safest and best course to carry the offenders before a magistrate as soon as circumstances will permit."

There are no statutory provisions expressly taking away or modifying the common law in this regard, and the welfare and security of the public demand that no statute should be given that effect unless such was the manifest intent of the legislature.    Indeed it is an established principle that, "The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language: *Dewey* v. *St. Albans Trust Co.,* 57 Vt. 332.    The sections in question may well be construed to mean that whenever a prisoner is committed to jail upon a warrant or process, the officer committing him shall deliver to the keeper of the jail an attested copy thereof and a true copy of the same to a person demanding it; but that they in nowise abridge the common law right of arrest and commitment without warrant, nor the right of commitment upon an order of a court of record and of general jurisdiction.

It is also said by the respondent's counsel that when a respondent is released on bail, his subsequent commitment, upon discharge of bail, can only be under the provisions of section 2028-2029, V. S.    It will be seen upon examination of these sections that provision is made therein for bail who wishes to surrender the principal in discharge of his recognizance, to apply for a warrant to apprehend the principal and commit him to jail, and that thereupon such warrant, directed to any sheriff or constable in the state, shall be issued, and that, on commitment of the principal to jail thereon, the bail shall be discharged; and that an officer on receipt of such warrant and tender of his fees shall apprehend the principal and commit him to jail according to directions therein, and leave with the jailer a copy of the same with his return thereon.    These provisions are applicable only when the bail wishes to surrender his principal, and for that purpose procures a warrant to apprehend him and commit him to jail in discharge of bail.    They

have no application when the principal is surrendered in court in discharge of bail without such warrant, as was done in the deer killing case, nor when the principal renders himself in court for that purpose and procures the discharge of his bail. It is said in Tidd's Practice (4 Am. Ed.) 282, that a defendant having put in bail, may render himself, or be taken and rendered in discharge of bail, at any time pending the action; and the right of a respondent to render himself for that purpose was recognized by this court in *Re Fitton,* 68 Vt. 297. Neither can it be contended that a bail warrant is neccessary when, in the discretion of the court, a person on trial for felony is ordered into custody, as he may be under the provisions of section 1981, V. S. No error therefore was committed in disregarding the second, fourth, fifth, and sixth requests.

The respondent excepted to that part of the charge where the court said, "But you will remember that if you find the transaction to have been as stated by Sheriff Spafford, and that the respondent intentionally fired at Hoffman, and he was acting with the sheriff, a part of the instructions to be hereafter given will have no bearing on the case."

Sheriff Spafford testified, among other things, that he had previously seen the respondent and his father, had been introduced to them, had told them that he was the sheriff of the county, and that they were turned over to him as such by his deputy, Lee Cady, who had them under arrest in the street at Woodstock, and that he then committed them to jail, where he afterwards saw the respondent and talked with him on several different occasions; that when he and Hoffman came upon the two Shaws, they were four or five feet apart; that he, Spafford, hailed them and demanded their surrender, whereupon, the Shaws seized their rifles and Dustin aimed at Spafford, and the respondent at Hoffman, who stood on the right of Spafford and a little back; that then Spafford said to them, "Hold on,

boys, we are not going to have any shooting here!" to which Dustin replied, "No, hold on! we don't want any shooting!" and dropped the muzzle of his gun; but that the respondent continued to hold his aimed at Hoffman; that Hoffman said, "Drop that gun, Frank, or I will bore you!" and repeated it "Drop that gun, I tell you!" whereupon immediately Frank fired and Hoffman threw his arms over his head, fell over backwards exclaiming, "Oh, God! he has killed me!" and that then shots were exchanged between Spafford and the respondent, and the latter ran into the woods and disappeared from view.

This evidence tended to show that the respondent and his father knew Sheriff Spafford, both personally and officially, and by his demanding their surrender, the respondent knew the sheriff's purpose in being there was to effect their arrest; that the respondent saw Hoffman in company with the sheriff, saw their concerted movements, heard Hoffman's demands to drop the gun, and knew that he was acting with the sheriff; therefore further notice of Hoffman's character and intentions was not required; for notwithstanding the fact that neither Spafford nor Hoffman had by express words stated to the respondent and his father that Hoffman was there with the sheriff to assist him, the surroundings and attending circumstances were such as to make it plain to them that he was there for that purpose, thus making it unnecessary for notice thereof to be expressly given: *Rex* v. *Davis,* 7 Car. & P. 785; *Rex* v. *Haworth,* 1 Moo. C. C. 207; *Rex* v. *Woolmer,* id. 334; *Rex* v. *Payne,* id. 378. And Hoffman was entitled to the same protection under the law as the sheriff himself: *Queen v. Porter,* 12 Cox's C. C. 444. This evidence also tended to show that the respondent, knowing Spafford and Hoffman to be there for the purpose of effecting his authorized arrest, intentionally fired at Hoffman; and it discloses nothing improp-

erly done by the sheriff or Hoffman in pursuing that purpose before the homicide.    In these circumstances, if the jury found this evidence to be true, the killing of Hoffman by the respondent constituted the crime of murder regardless of the question of malice, for the law does not allow that a lawful arrest is a provocation to passion and heat,—*State* v. *Taylor & O'Donald, supra; Queen* v. *Porter, supra; State* v. *Oliver,* 2 Houst. 585,—and the question of self defense was not applicable.    Therefore, the instructions subsequently given relative thereto would have no bearing on the case, and the part of the charge excepted to was without error.

Exception was also taken to that part of the charge instructing the jury that "If resistance to authorized arrest, which is being properly made, results in the death of the officer, the crime will be murder, regardless of the question of malice."    But it has been seen in discussing the exception last considered that this was proper.    No other exceptions taken to the charge are relied on in the respondent's brief.

When the case was submitted to the jury, the plan made by the witness Batchelder, and three photographs, exhibits in the case, were allowed to go to the jury room for the consideration of the jury, to which exception was taken.    It was within the discretion of the court to allow this to be done, and the exception is unavailing: In *Re Barney's Will,* 71 Vt. 217.

This disposes of all the exceptions upon which the respondent relies in his brief, none of which are sustained.

*It is therefore considered that judgment ought to be, and it is rendered upon the verdict.    Let sentence be imposed and execution thereof done.*