(No. 13568.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARRY ANDRAE *et al.* Plaintiffs in Error.

*Opinion filed December 21, 1920.*

1. CRIMINAL LAW—*how former conviction of witness must be proved.* To affect credibility the former conviction of a witness must be shown by a properly authenticated copy of the record, which must contain at least the caption, the entry showing the return of the indictment into open court by the grand jury, the indictment and record of arraignment, the empaneling of the jury or the waiver of a jury, and the final judgment.

2. SAME—*pardon does not preclude proof of conviction to affect credibility of a witness.* The admission in evidence of the record of a former conviction of a witness for the purpose of affecting his credibility is not precluded because he was pardoned or obtained a commutation of the sentence.

3. SAME—*effect of filing petition for release on probation.* As section 2 of the act providing for a system of probation provides that the convicted person may be admitted to probation when "nothing remains to be done by the court except to pronounce sentence," the filing, after denial of a motion for new trial, of a petition for release on probation waives defendant's right to make a motion in arrest of judgment and is an admission that nothing remains to be done by the trial court except to pronounce sentence.

4. SAME—*what is meant by "after entry of judgment," in section 2 of Probation act.* The phrase "after entry of judgment," used in section 2 of the act providing for a system of probation, (Hurd's Stat. 1917, p. 1049,) means that period in the proceedings where the accused has taken all the steps he desires to take and where the court has decided finally to receive and enter the plea or verdict of guilty on the records of the court.

5. SAME—*a defendant is convicted though released on proba-
tion.* As affecting the credibility of the testimony of a defendant
in a murder trial, a record showing that he had previously been
tried on a charge of burglary and found guilty by the jury is ad-
missible as showing a former conviction even though no sentence
was pronounced, where such record also shows that after his mo-
tion for new trial was denied the defendant filed a petition for re-
lease on probation and that an order releasing him on probation was
entered. (*Faunce* v. *People,* 51 Ill. 311, distinguished.) .

6. SAME—*release on probation does not set aside the conviction.*
A release on probation does not in any way set aside the convic-
tion. of. the accused nor preclude the admission of the record of his
conviction in evidence for the purpose of affecting the credibility
of. his testimony in a subsequent trial.

7. SAME—*when all participants in a burglary are guilty of re-
sulting murder.* Where all participants in a burglary were armed
with loaded revolvers each is guilty of a murder committed by one
of them, who, while the others were in another part of the building,
shot and killed a watchman who had refused to hold up his hands.

8. SAME—*when conviction may be had on testimony of accom-
plice.* The testimony of an accomplice is admissible against a de-
fendant, and a conviction upon such testimony may be sustained
if it is of such a character as to prove the guilt of the accused
beyond a reasonable doubt.

9. SAME—*what credibility should be given testimony of an ac-
complice.* The testimony of an accomplice should be acted upon
with great caution, and the jury should subject such testimony to
careful examination in the light of all other evidence in the case
and consider the influence under which the testimony is given and
whether the purpose of the witness is to shield himself from pun-
ishment, obtain some benefit or gratify his malice.

10. SAME—*court should allow liberal cross-examination of ac-
complice who testifies for prosecution.* Where the identity of the
defendants and their connection with the crime charged depends
wholly upon the testimony of an accomplice who is a witness for
the People, the court should allow a liberal cross-examination of
the witness so as to show, if possible, what influences caused him
to testify for the People.

11. SAME—*what remark by court is improper.* A remark by the
court in a murder trial during a colloquy with the counsel, the ef-
fect of which is to imply that counsel for the accused are attempt-
ing to try the case by unfair means, is improper, where there is
nothing in the record to justify such remark.             . .

12. SAME—*what evidence is inadmissible as implying.participa-
tion. in another offense.* In a trial for murder committed as a re-

sult of a burglary, a confessed accomplice should not be permitted to testify for the People that some time previous to the commission of the crime charged he and one of the defendants delivered a load of automobile tires to a junk dealer, even though there was no attempt to show that the tires were stolen, as the impression left in the minds of the jurors would naturally be that such defendant had been associated with the witness in other thefts.

13. SAME—*court should refuse argumentative instructions on subject of reasonable doubt.* The trial court should refuse lengthy and argumentative instructions as to the meaning of the term "reasonable doubt," whether the instructions are offered by the People or the accused.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HUGO PAM, Judge, presiding.

THOMAS D. NASH, MICHAEL J. AHERN, and EUGENE L. McGARRY, (THOMAS E. SWANSON, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, JAMES C. O'BRIEN, and JOHN M. LOWERY, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

About one o'clock in the morning of February 7, 1920, four men entered the building of the Western Shade Cloth Company of Chicago for the purpose of stealing a large sum of money which they expected to find in the company's safe. Two men seized the watchman, John Ritas, and tied his hands behind him. From him they learned there were four men in the boiler room. Two other men joined the two who had seized the watchman, and the four took the watchman to the basement, where the engineer and the three firemen were seized and bound. Two men took the watchman to the office, and while one of them guarded him the other began to drill a hole in the safe. The other two

men remained on guard in the basement. One was a tall man dressed in a blue overall suit and is referred to by the witnesses as a farmer, and the other was a short man wearing a dark-colored military overcoat and is called the soldier. The farmer left the boiler room and went up-stairs toward the office. While he was gone, Thomas O'Donnell, another watchman, came into the engine room. The soldier, who was guarding the four bound employees, ordered O'Donnell to throw up his hands. O'Donnell would not obey the order, and after his persistent refusal on repeated demands the soldier fired a shot over his head. He again demanded that O'Donnell throw up his hands, and when O'Donnell refused he shot him through the abdomen. The farmer returned to the boiler room and the soldier told him what had happened. The farmer took O'Donnell's gun away from him and put it in his pocket. He then went up-stairs to notify his companions what had happened. The four engine men were locked in the elevator shaft and the burglars fled from the building. The watchman who had been left in the office made his way to the engine room and found O'Donnell groaning with pain. He went across the street to another building to get help. The men there cut the cords from his wrists and sent in a call for the police. The watchman returned to the building and released the engine men from the elevator shaft and cut the ropes with which they were bound. O'Donnell died as a result of the gunshot wound. All the burglars wore masks and none of the company's employees could give a very accurate description of their assailants. Guy Wadsworth was arrested at his home near Chicago March 5, 1920. He confessed that he was the tall man dressed in blue jumper and overalls who entered the building of the Western Shade Cloth Company early on the morning of February 7. On his testimony an indictment was returned charging Harry Andrae and Richard Wilson, plaintiffs in error, and Carl Crawford, Leo Ryschel and Guy Wadsworth, with the murder

of Thomas O'Donnell. Crawford and Ryschel have not been arrested on this charge. Wadsworth testified at the trial and plaintiffs in error were convicted and their punishment fixed at death. They prosecute this writ of error to reverse the judgment of the criminal court of Cook county.

This conviction must stand or fall on the uncorroborated testimony of Guy Wadsworth. He testified that he was a farmer, living near Dolton, Cook county, Illinois; that his principal business was hauling garbage and swill from the restaurants and hotels of Chicago and feeding it to pigs on his farm; that from 1906 to 1915 he was a patrolman on the police force of Chicago; that prior to that time he worked for five years as conductor and motorman on the Chicago street cars and from 1897 to 1900 he was in the United States army. According to his story Leo Ryschel first suggested to him the burglary of the Western Shade Cloth Company's building. Ryschel told him there was opportunity to get a pay-roll of $25,000 and told him the nature of the protection at the building. He said he conveyed this information to Richard Wilson, who agreed to help get the money. Some two weeks before the burglary Carl Crawford went with him to the rear of the factory to see what time the watchman made his rounds and at what points he stopped to register. On the night of the burglary Wadsworth says he stopped at Wilson's home about 7:45 o'clock in the evening and asked him if he was ready to go with him to the Western Shade Cloth factory; that Wilson said his wife had company and he did not think he would be able to go, but that if Crawford could not get someone to take his place he would make arrangements to get away; that he first talked to Harry Andrae about this particular burglary shortly after he saw Wilson on the evening of February 6, and that Andrae said Crawford had told him to meet Wadsworth and make arrangements to go along. Wadsworth made his rounds of the restaurants, collected his garbage and had it in a Ford

295—29

truck when he met his three companions. The four of them got in the cab of the truck about 12:30 o'clock and started for the factory. Wadsworth had in his truck a canvas bag containing burglar's tools, which he says Crawford had prepared and told him to bring along. There were three guns, drills, a brace and bit, soap, percussion caps, nitroglycerine, and an extension cord which was used in connection with a high-speed drill. They had planned to meet at twelve o'clock so that they could catch the watchman on his one o'clock round, but Wilson and Crawford were late, so they had to wait to catch the watchman when he made his round at two o'clock. He testified further that they went in through a gate at the rear of the factory; that Crawford and Wilson stayed in the lumber yard and that he and Andrae climbed up the fire-escape to the third floor and crawled through a window. About 2:05 o'clock A. M. the watchman approached the clock key which was hanging in the room where they had concealed themselves. They tied and took him to the main floor, where they opened a window and admitted Crawford and Wilson to the building. Wadsworth's account of what took place in the building is practically the same as the account given by the employees, and so it is unnecessary to detail that part of his testimony. He further testified that after O'Donnell was shot they took the sack of tools and fled from the building; that they all left in the truck, Crawford and Wilson getting off at their homes and Andrae going to the farm with him. They arrived there about five o'clock. On the way out they talked about the shooting, and he says Andrae told him he had to shoot O'Donnell because he would not put up his hands. Wadsworth said he hid the revolver he had taken from O'Donnell but later he got it and threw it in the Calumet river.

Wadsworth is under indictment with three other men on three separate charges of burglary. He is corroborated in detail by Charles P. Novak, the engineer, John Michael and

John Parker, firemen, and John Ritas, watchman, and so
there can be no question of his participation in this murder.
The corroborating evidence does not, however, connect
either of the plaintiffs in error with the commission of the
crime except in two minor details.  Andrae owned a mili-
tary overcoat which he had had dyed black, and it was
identified by the witnesses as an overcoat similar to the one
worn by the man who shot O'Donnell.  Andrae's voice was
high-pitched, and Michael testified that the man who killed
O'Donnell talked like Andrae.  He heard him testify on
May 27, 1920, and it was the following day, nearly four
months after he heard his assailant talk in the boiler room,
that he testified the voice of the witness Andrae was simi-
lar to the voice of the murderer.  There is no corrobora-
tion identifying Wilson with the crime.

Andrae testified that he was twenty-five years of age;
that he lived at 2025 North Spaulding avenue, Chicago,
and that he had been employed as a driver by the National
Biscuit Company, the Manufacturers Motor Express Com-
pany and the Team Motor Service.  When he was arrested
he was working for the American Railway Express Com-
pany.  He testified that he was working as extra in the
early part of February and that he did not remember
whether he was working on the 6th.  He further testified
that he had seen Guy Wadsworth but did not know him
personally.  He met him in December, when he was sent
by his employer, the Manufacturers Motor Service, to
drive a truck for Wadsworth.  He went to Seventy-fourth
and Halsted, in Chicago, and there met Wadsworth, who
wanted him to drive a truck in which to haul whisky.  He
says he refused to drive the truck and returned to his em-
ployer and did not see Wadsworth again until he saw him
in the State's attorney's office in March.  He denies seeing
Wadsworth on February 6 or 7, denies going to the West-
ern Shade Cloth factory with him, and denies having any-
thing to do with this burglary or murder.  He was arrested

about 1:15 o'clock A. M., March 10, at the office of his
employer and was taken to the State's attorney's office,
where he found seven men awaiting him.  He was kept
there until five o'clock in the morning, when he was taken
to a police station.  Later in the day he was brought back
to the State's attorney's office and heard Wadsworth make
a statement accusing him and other people of burglarizing
the Western Shade Cloth Company's building.  He denied
the charge then and there.  They asked him if he had been
in the army and if he had an army overcoat.  He told them
that he had been in the army and that he had two army
overcoats, one of which he had had dyed black.  He told
them they were at his home, in the clothes closet.  An offi-
cer brought these coats to the State's attorney's office, and
Wadsworth identified the dark overcoat as the one which
Andrae wore on the night of the murder.  Andrae testi-
fied further that he did not know Crawford and that he
had never been anywhere with him.

Julia Andrae testified that she lived at 2025 North
Spaulding avenue and that she was a clerk employed by
Albert Pick & Co.  She is a sister of plaintiff in error Harry
Andrae.  On February 6, 1920, she attended a card party
and dance at Constellation Temple.  She left the party about
11:45 o'clock and reached home about 12:30.  She kept
some of her clothes in the bed-room where her brother
slept.  When she came home she looked in the bed-room
and saw her brother there, asleep.  She went to the dining-
room, where her sister and a young man who had been
with them to the dance were sitting, and remarked to them
that everybody was at home.  They remained up about half
an hour, and she did not see her brother leave the house
during that time.  She went into his bed-room between
6:30 and 7:00 o'clock the next morning to get a dress she
desired to wear that day, and her brother was there in bed.
Another sister, Anna Andrae, a ledger clerk employed by
the Chicago Telephone Company, and Arthur Hammill, ma-

terial clerk for the Western Union Telegraph Company, cor-
roborate the statement of .Julia Andrae as to time.   Neither
of them saw Harry Andrae that night, but they heard Julia
say when she came into the dining-room that everybody
was home.  ·

To impeach the testimony of Harry Andrae, the Peo-
ple, over the objection of plaintiffs in error, introduced in
evidence a record of a previous conviction of Andrae for
burglary.   The record introduced showed that Andrae had
been found guilty of burglary by a jury and that a petition
for release on probation had been filed and an order releas-
ing him on probation entered.   It is contended by plaintiffs
in error that the record introduced does not show a con-
viction for an infamous crime because no sentence was im-
posed.   In *Faunce* v. *People,* 51 Ill. 311, a witness who had
been convicted of larceny but who had not been sentenced
was permitted to testify.   It was contended that under the
statute rendering persons convicted of infamous crimes in-
competent to give testimony this witness was not competent
to testify.   The court there held that under that statute con-
viction meant judgment on the verdict of guilty.   This stat-
ute was later amended and the common law disability re-
moved.   A person is now no longer incompetent to testify
as a witness by reason of his having been convicted of a
crime, but his conviction may be shown for the purpose of
affecting his credibility.   This conviction must be shown
by a properly authenticated copy of the record, which must
contain at least the caption, the entry showing the return
of the indictment into open court by the grand jury, the
indictment and record of arraignment, the impaneling of
the jury or the waiver of a jury, and the final judgment
of the court.   (*Bartholomew* v. *People,* 104 Ill. 601; *Kirby*
v. *People,* 123 id. 436; *Clifford* v. *Pioneer Fireproofing Co.*
232 id. 150.)   Most authorities hold that in order to con-
stitute a conviction of crime on which evidence can be given
to affect the credibility of a witness, there must be not

only a verdict of guilty but also a judgment thereon by
the court. (*Marion* v. *State*, 16.Neb. 349, 20 N. W. 289;
*People* v. *Mannausau*, 60 Mich. 15, 26 N. W. 797; *Hackett*
v. *Freeman*, 103 Iowa, 296, 72 N. W. 528; *Commonwealth*
v. *McDermott*, 224 Pa. 362, 73 Atl. 427; *People* v. *Fabian*,
192 N. Y. 443, 85 N. E. 672; 40 Cyc. 2611.) In many
other jurisdictions, however, it is sufficient that the guilt
of a witness has been established by a plea or a verdict
of guilty. (*State* v. *Shaw*, 73 Vt. 149, 50 Atl. 863; *State*
v. *Knowles*, 98 Me. 429, 57 Atl. 588; *People* v. *Ward*,
134 Cal. 301, 66 Pac. 372; 7 Ency. of Evidence, 215.) A
pardon does not preclude such conviction from being put in
evidence; (1 Wharton on Crim. Evidence, sec. 489; *Ter-
ritory* v. *Chavez*, 8 N. M. 528, 45 Pac. 1107;) nor does
a commutation of the sentence affect the admissibility of
the record. (*Rittenberg* v. *Smith*, 214 Mass. 343, 101 N. E.
989.) Section 2 of the act providing for a system of pro-
bation provides that the court may "after entry of judg-
ment and nothing remains to be done by the court except
to pronounce sentence" admit certain convicted persons to
probation according to the provisions of the act. (Hurd's
Stat. 1917, p. 1049.) After the jury returned the verdict
finding Andrae guilty of burglary he filed his motion for
a new trial, and this motion was overruled. No motion in
arrest of judgment was filed, but after the motion for a
new trial was overruled Andrae filed his petition request-
ing release on probation. While a convicted defendant has
the right to file a motion for a new trial and a motion in
arrest of judgment he is not required to file either, and by
filing his petition for release on probation, or by otherwise
indicating the waiver of his right to file either or both these
motions, he must be held to have waived his right, and in
subsequent proceedings by the court will be estopped from
taking advantage of his failure to exercise these privileges.
When a prisoner enters his plea of guilty or where the
prisoner is found guilty by the verdict of a jury it is not

necessary for the court to enter a judgment finding the prisoner guilty. When the court receives and enters the plea or verdict of guilty, it follows as a legal inference that the court finds the defendant guilty. (*Hoch* v. *People,* 219 Ill. 265; *Commonwealth* v. *Ingersoll,* 145 Mass. 381, 14 N. E. 449; *State* v. *Herlihy,* 102 Me. 310, 66 Atl. 643.) "After entry of judgment," as used in section 2 of the Probation act, must therefore be held to mean that period in the proceedings where the prisoner has taken all the steps he desires to take and where the court has decided finally to receive and enter the plea or verdict of guilty on the records of the court. Under the law the court is not permitted to entertain a petition for release on probation until this period is reached in the proceedings. The filing of the petition for release on probation is evidence, therefore, that the prisoner accepts the action of the court in entering the plea or verdict of guilty as final so far as the trial court is concerned, and by filing this petition admits that all proceedings have been taken in the trial court up to the point of sentence and that nothing remains to be done by the court except to pronounce sentence. The reason for holding that the sentence is a part of the conviction is that a conviction is not legally established until the final judgment of the court is entered upon the plea or verdict of guilty. This is because the court may set aside the plea or verdict of guilty on proper motion and grant a new trial, or the court may, for good cause shown, arrest the final judgment and never legally determine the guilt of the prisoner. None of the courts holding the sentence to be a part of the conviction had before them an act containing the provisions of our act authorizing release on probation. When no issue, either of law or fact, remains to be determined and there is nothing to be done except to pass sentence, there is no sound reason for holding that the prisoner has not been convicted. Our present statute does not in any manner affect the competency of the witness, and it is not

necessary to construe the term "conviction" with the strict-
ness required at the time the decision in *Faunce* v. *People,
supra,* was rendered. Our present statute deems the con-
victed person still capable of telling the truth, but permits
the fact of conviction to be shown as a sidelight upon his
character, thus affecting his credibility. As we said in *Bar-
tholomew* v. *People, supra,* it is the conviction,—not the
punishment,—for the offense that may be shown for the
purpose of affecting credibility. All that is necessary to be
shown is that it has been finally established by a court of
competent jurisdiction that the prisoner has been guilty of
an infamous offense legally presumed to affect his credi-
bility. The fact that the criminal court of Cook county re-
leased Andrae on probation shows that the court had re-
ceived and entered the verdict of guilty on its records and
had finally determined the guilt of the prisoner. The fact
that the court determined that there was reasonable ground
to expect that the defendant might be reformed and that
the interests of society would be best subserved by disci-
plining the defendant on probation rather than in the re-
formatory or penitentiary would not in any way affect the
previous determination of the court that the defendant was
guilty of an infamous offense. The release on probation
does not in anywise set aside the conviction of the prisoner.
If it did, the prisoner could be released on probation time
after time, because the act says certain defendants not pre-
viously convicted are eligible to release on probation. This
construction would not be in accordance with the intent and
purpose of the act, which was designed to reform first of-
fenders. When the court, according to the provisions of
the act, decides that the prisoner should be released on
probation, it merely, at the request of the defendant and
by authority of the law, continues the cause for further
proceedings under the act. Having taken advantage of the
beneficent privileges of the act, there is no reason in law
or justice why the convicted person should later be permit-

ted to contend that he has not been convicted because he was not sentenced to a penal institution. The court did not err in receiving this record of conviction.

Mr. and Mrs. Joseph Lillus testified on behalf of plaintiff in error Wilson that they lived at 3979 Vincennes avenue and that they spent the night of February 6, 1920, at his home. Lillus is a packer employed by the John Sexton Company. Mrs. Lillus is a stenographer employed by the Consumers Company. She had known Mr. and Mrs. Wilson four or five years, and she had introduced Lillus to them some months before her marriage to him, on December 28, 1918. They both testified that on February 6 they arrived at the home of the Wilsons about six o'clock; that they had dinner there; that after dinner they visited and played cards until after midnight; that they prepared to go home about 12:30 o'clock, but because it was so late Mrs. Wilson insisted that they stay all night; that they decided to stay and Mrs. Wilson fixed lunch and they ate it; that they went to bed about 1:30 o'clock A. M.; that plaintiff in error Wilson was at home all evening and was in the house when they retired; that he was there at 6:30 o'clock the next morning, when they got up; that they fix the time by the fact that Wilson had bought a new automobile that day, and by the fact that Maurice Enright, a murdered labor leader, was buried the same day, and that they talked of both these events that evening.

John F. Haley, who lived next door to plaintiff in error Wilson, testified that he had known Wilson for two years and that he saw him at his house about 7:30 o'clock in the evening of February 6, 1920. He called at Wilson's home to borrow an extension wire to use on a light out in his shop. He was in Wilson's kitchen and dining-room, and while there was introduced to Mr. and Mrs. Lillus, a young couple he had never seen before. He did not see Wilson again that night, but at midnight, when he banked his fire preparatory to going to bed, he noticed that the

lights were still burning in Wilson's home. Haley has been receiving teller in the Illinois Trust and Savings Bank for the past sixteen years. He was acquainted with assistant State's attorney Lowery and went to the State's attorney's office after Wilson's arrest and told Lowery what he knew about the case and asked if anything could be done for Wilson. He, too, recalled that Enright's funeral was held that day, and that while he was at Wilson's home Wilson told him of seeing the big funeral procession pass through the down-town district and commented on the fact that there was so much in the papers about it.

Plaintiff in error Wilson contends that he cannot be held to be guilty of murder because he was not present when O'Donnell was killed and did not aid, abet or assist in the killing, nor did he advise or encourage the murderer in the perpetration of the crime, his contention being that even if the evidence were sufficient to justify the finding that he agreed to assist in the burglary of the building, it would not follow that he could be held guilty of the murder, because in the ordinary mode of performing a burglary it is not likely that a human life will be destroyed. Such contention cannot be sustained. Each of the four men who participated in this burglary was armed with a loaded revolver. No other conclusion can be drawn from the facts in this case than that the burglars expected they might have to use these guns to overcome the watchman and thereby gain admittance to the building or to prevent interference with their plans to escape. When loaded revolvers are chosen to resist interference with one's plans, the natural presumption is that there will be shooting if it is found necessary to accomplish the original purpose, and destruction of human life not infrequently is the result of the reckless discharge of firearms. The authorities are uniform in their holding that all the men who took part in the burglary of this building are guilty of the murder of Thomas O'Donnell. (*Spies* v. *People,* 122 Ill. 1; *People* v. *Anderson,* 239

id. 168; *People* v. *Gukowski,* 250 id. 231; *People* v. *Powers,* 293 id. 600.) This question is fully discussed and conclusively settled in the *Spies case.*

Plaintiffs in error contend that they were unduly limited in their cross-examination of Guy Wadsworth. In the direct examination Wadsworth gave a general history of his life from the time he entered the United States army, in 1897, to the date of the trial. During his examination it developed that he lived in Arizona about two months in 1918. Plaintiffs in error sought to find out by cross-examination what he was doing there, but the court would not permit it. They further inquired of the witness whether assistant State's attorney Lowery had promised him that he would save him from going back to Arizona if he would make his statement about the burglary, and the court refused to require this question to be answered. It was also sought to show by cross-examination that Wadsworth owed plaintiff in error Wilson, who was an optician, a bill for some spectacles, and that they had had several disputes about this bill, but the court denied them the right to go into this matter. Wadsworth testified on direct and cross-examination that he had not been promised immunity, but the court would not permit plaintiffs in error to go into details about this phase of the case and sustained objections to the following questions: "Do you expect to go down to the penitentiary for from fourteen years to life on this charge?" "Do you expect to go to the penitentiary on a sentence for murder on this charge?" "Do you know that under the law you could be hanged for your participation in this crime?"

The testimony of an accomplice is admissible against a defendant in a criminal case, and a conviction upon such testimony may be sustained if it is of such a character as to prove, beyond a reasonable doubt, the guilt of the accused. It is, however, uniformly held that the testimony of an accomplice is subject to grave suspicion and should

be acted upon with great caution. The jury should subject such testimony to careful examination in the light of all other evidence in the case and consider the influence under which the testimony is given and whether the purpose of the witness is to shield himself from punishment, to obtain some benefit for himself or to gratify his malice. (*People v. McKinney,* 267 Ill. 454.) The credibility of Wadsworth was a question for the jury, and his testimony was to be carefully weighed in view of his character, his connection with the crime and any motive that may have influenced him to offer himself as a witness in behalf of the prosecution to aid in the conviction of plaintiffs in error; and this is especially true when it is remembered that he had served on the police force for nine years, and that he was, no doubt, familiar with court procedure and the manner of giving testimony. Unless he obtained some benefit by giving his testimony his plea of guilty would result in the same judgment as if he had been found guilty by a jury, and plaintiffs in error had a right to ascertain all facts having a legitimate tendency to throw light upon the truthfulness of his story, so that the jury would be advised of everything which would enable them to judge of the credit to be accorded to his testimony. In view of all the circumstances of this case the court should have been exceedingly liberal in its rulings on objections limiting the cross-examination of Wadsworth. The identity of plaintiffs in error with this crime depends wholly upon the testimony of Wadsworth, and they were entitled to show by the only means at hand,—the cross-examination of this witness,—what influence operated on his mind to cause him to testify on behalf of the People. The court erred in sustaining these objections.

When plaintiffs in error pressed their questions regarding the life and occupation of Wadsworth while in Arizona a short colloquy took place between the court and counsel, and during this colloquy the court said, among other things,

"Let us try this case by fair means, by any means." This was an imputation that counsel for plaintiffs in error were trying the case by unfair means, and there is nothing in the record to justify any such reprimand.

It was also error for the court to permit witness Wadsworth to testify that on March 2, 1920, he and plaintiff in error Andrae delivered a load of automobile tires to David Goldberg's junk yard, and it was error to permit Goldberg to testify that plaintiff in error Andrae and witness Wadsworth brought to his place on the second day of March a load of automobile tires. There is no proof in the record that these tires were stolen, but the impression necessarily left in the minds of the jurors was that plaintiffs in error had been associated with Wadsworth in other thefts.

People's eighth instruction told the jury: "A reasonable doubt means in law a substantial and well-founded doubt and not the mere possibility of a doubt. The jury have no right to go outside of the evidence to search for or hunt up doubts in order to acquit the defendants, not arising out of the evidence or from the want of evidence." Just what is meant by the last phrase of this instruction we are unable to determine. In discussing a similar unintelligible instruction we said in *People* v. *Jordan*, 292 Ill. 514: "Among the metaphysical refinements concerning the genesis, attributes, limitations and effect of a reasonable doubt it is recognized in legal philosophy that an insufficiency or lack of evidence to prove an accused guilty beyond a reasonable doubt may engender in the minds of a jury such reasonable doubt. It is the insufficiency or lack of evidence offered by the People to prove guilt which creates a reasonable doubt, but it is a different proposition to say that a lack of evidence from any source may be considered by the jury in determining whether they have an abiding conviction of the guilt of the defendant arising from that state of the evidence. That would include a failure of the defendant to testify to facts within his knowledge or to pro-

duce evidence to meet the evidence for the People. After stating a recognized rule concerning doubt the instruction practically said to the jury that if they had an abiding conviction of the guilt of the defendant arising from the evidence offered and a lack of evidence from any source they would be satisfied beyond a reasonable doubt." People's eighth instruction should not have been given. It is certain that an instruction of this character does not clarify the term "reasonable doubt," and as we have said many times, it is doubtful whether the lengthy discussion of the subject contained in instructions 9 and 10 is illuminating. The trial court should refuse argumentative instructions on this subject, whether offered by the People or the defense. *People* v. *Miller,* 292 Ill. 318.

The conviction of plaintiff in error Wilson rests solely on the uncorroborated testimony of the witness Wadsworth, and the corroborating evidence identifying plaintiff in error Andrae is of doubtful value. Andrae testified in his own behalf and denied all connection with or knowledge of this murder, and denied that he aided, abetted, advised or assisted in any way in the burglary of the building of the Western Shade Cloth Company. There is no more reason to disbelieve his story than there is to disbelieve the story of Wadsworth. The corroboration of his statement that he was at his home when this murder was committed is stronger than the corroboration of Wadsworth's statement that Andrae was present at the killing and was the one who fired the fatal shot. In view of all the circumstances in this case we feel that safety and justice require that the cause shall be tried again.

For the errors hereinbefore pointed out the judgment is reversed and the cause is remanded to the criminal court of Cook county.          *Reversed and remanded.*