(No. 13721.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAM CARDINELLI, Plaintiff in Error.

*Opinion filed February 15, 1921—Rehearing denied April 7, 1921.*

1. CRIMINAL LAW—*ground upon which undenied accusations in presence of the accused are admissible.* The ground upon which statements made in the presence of the accused charging him with the crime are admissible against him on his trial is that his silence when he might and naturally would deny the accusations of guilt if they were untrue is regarded as an acquiescence in their truth and an implied admission of guilt, and if such accusations are denied *in toto* they are not admissible.

2. SAME—*effect where accused partly admits the incriminating accusations.* If one suspected of crime admits in whole or in part the accusations made in his presence charging him with the crime then both the statement and reply are competent evidence on his trial, and if he at first denies that he knows the men charging him with instigating a murder committed by them or that they were at his place of business on the day of the crime such denial may be proved when he subsequently admits that he knows the men and that they were at his place of business though he denies that he had knowledge of the intended crime.

3. SAME—*when motion to strike out testimony is properly denied.* If a portion of the testimony of a witness in a murder trial

is competent, a motion to strike out all of his testimony is properly denied, as in such case a motion to strike should be limited to the objectionable parts of the testimony, and these should be pointed out in the motion.

4. SAME—*when court is justified in. calling a witness.* Where one of the two defendants indicted for murder withdraws his plea of not guilty and pleads guilty during the process of selecting the jury, the court may, after a new panel is called and the other defendant is placed on trial, call as a witness the one who has plead guilty, if the court is of opinion such course is necessary to prevent a miscarriage of justice.

5. SAME—*when improper cross-examination will not cause reversal.* Improper cross-examination of a witness for the defendant with respect to the number of times he had been in jail and whether he had ever pleaded guilty to highway robbery is harmless, where the record shows that shortly before the trial he had entered a plea of guilty to a charge of robbery and had been released on probation.

6. SAME—*purpose of review is not to determine whether the record is perfect.* The purpose of reviewing a judgment of conviction in a criminal case is not to determine whether the record is perfect, but whether the defendant has had a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt, and if the errors in the record could not reasonably have affected the result of the trial the judgment should be affirmed.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. KICKHAM SCANLAN, Judge, presiding.

THOMAS D. NASH, and MICHAEL J. AHERN, (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWIN J. RABER, EDWARD E. WILSON, and JOHN E. OWEN, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Andrew P. Bowman, proprietor of a saloon and restaurant at the corner of Canal street and Twenty-second street, in the city of Chicago, was robbed and murdered in

his place of business June 24, 1919. At the December term of the criminal court of Cook county Sam Cardinelli, plaintiff in error, and Nicholas Viana, Thomas Errico, Leonard Crapo, and two others whose true names are unknown and who have not been apprehended, were indicted for the murder. Viana, Errico and Crapo each pleaded guilty and Cardinelli was placed on trial under his plea of not guilty. Cardinelli was found guilty and his punishment fixed at death. He prosecutes this writ of error to review the judgment entered on the verdict.

Cardinelli is thirty-nine years of age. He was born in Sicily and came to this country twelve years ago. June 24, 1919, and several months prior and subsequent thereto, he was conducting a poolroom at 217 West Twenty-second street, a short distance from the scene of the murder. November 23, 1919, he was arrested for the murder of Bowman, the theory of the State being that he was guilty as an accessory. His arrest followed confessions of Viana and Errico. November 15, 1919, Viana, Errico and one Campione murdered Martin Kubalanza. They were tried on that charge previous to this trial, found guilty and sentenced to death. In their several confessions they stated that Cardinelli was operating a den for thieves and highwaymen, and that he encouraged and aided a gang of baby bandits who made his place their headquarters in the perpetration of crime. Viana is eighteen years of age and Errico and Crapo are each nineteen years of age.

Nettie M. Bowman, wife of deceased, testified that the saloon and restaurant conducted by her and her husband was in a factory district, and that it was their custom to cash the pay checks of employees working in the near by factories. The Henneberry Printing Company, a large establishment located just west of their place of business, was accustomed to paying its employees on Tuesday, Friday and Saturday. She testified further that on Tuesday, June 24, 1919, deceased brought from the bank $2000, and that he

had in the saloon in addition to this sum $600 or $700; that she knew Nicholas Viana well; that he had been employed at Henneberry's and that he had taken his meals with them and had had his checks cashed at their place of business; that she had seen Cardinelli and that he had been in their place of business shortly before the robbery, and that while she could not say positively, she thought it was in the forenoon of the same day; that she saw him next after his arrest in November and recognized him at once because of his unusually large neck; that he was in their place twice, and that on one occasion another Italian was with him; that late in the afternoon of June 24 two young men came in and sat down at a table; that they had their hats pulled down and kept their faces turned from the witness; that shortly after they came in an automobile stopped in front of the side door; that a young man jumped off the running-board of the automobile and rushed into the restaurant and asked for a roast-beef sandwich; that while witness was getting the sandwich she heard running and shouting and pistol reports; that as the men ran out of the place she rushed back of the bar and found her husband huddled on the floor; that he was seriously wounded and died almost immediately; that one Wendell, a customer, was also murdered; that she called the police and they reported at once; that on investigation she found that all the money was gone. On cross-examination she testified that she recognized Errico and Crapo as two of the assailants.

Charles A. Laurent, who lived at 6728 Lafayette avenue, Chicago, testified that he was in the vicinity of Bowman's place on the day of the murder; that he was attracted by several men hurriedly getting into a machine; that they were shouting and that the machine was under way before all the men got in; that thinking the men had committed some offense he took the license number of the automobile and turned it over to a police officer who came with the patrol wagon.

David C. Revere, a police officer, testified that he received the license number of the automobile; that they investigated and found that the car bearing that number was registered in the name of Santo Orlando, who lived at 1023 Larrabee street, in Chicago; that the officers went to this number, arriving there between 5 P. M. and 5:30 P. M., and found a Dodge touring car standing in the yard at the rear of the house; that they examined the car and found the radiator very hot; that they searched the house and the premises for Orlando but were unable to find him; that they took the car to the city garage and left it there. About a week later Orlando's body was found in the canal. He had been shot to death and his body thrown in the canal after he was dead.

Thomas Errico was called as a witness on behalf of the People and testified that he had participated in the murders of Kubalanza and Bowman and that he was under sentence of death in the Kubalanza case; that after his arrest in the Kubalanza case he confessed to the Bowman murder and told of Cardinelli's participation in it; that he had known Cardinelli seven or eight months before Bowman was killed; that he met him in his poolroom; that he went to the poolroom about twice a week; that he met Viana and Crapo and others there; that Cardinelli kept their guns for them when they were not using them; that one day when he called for his gun Cardinelli suggested to him that he ought to quit doing small jobs and that if he would get a big job he would fix him up with a car and some men to assist him; that about ten days before the Bowman murder Viana stated to witness that Bowman kept large amounts of money in his place on pay-days and suggested that they rob him; that the next day the matter was further discussed, and the three young men, Viana, Crapo and witness, decided the job was too big for them and went to Cardinelli for assistance; that on Saturday

before the murder Cardinelli told them he would get a car and some men from the north side and that they should be ready Tuesday; that witness had met Orlando in Cardinelli's poolroom about a week before the murder; that he did not then know his name but saw him come into the poolroom with some other men and talk with Cardinelli; that Cardinelli told these young men that if they handled this job successfully he could get some better jobs for them; that he warned them to keep quiet, saying, "Of course, you guys don't need to get the idea you can go ahead and squawk; you know what happens to guys that squawk;" that at ten o'clock Tuesday morning witness reported at Cardinelli's place; that Viana and Crapo reported later; that at two o'clock they asked Cardinelli why the car was not there, and he said the men must be late; that about 3:15 P. M. three men came in a car; that they went into a room at the rear of the poolroom and the three men began talking with Cardinelli; that some of the conversation was in English and some in Italian; that when the north side men found out there was but $2000 to be had they were angry and said if they had known that was all there was in it they would not have come; that the three north side men were about twenty-eight years of age; that some of the men had guns and Cardinelli furnished others; that he gave one of the strangers a 32-caliber revolver, and after examining it he threw it down, saying it was no good; that Cardinelli then gave him his gun and told him to be careful not to lose it, because the police might be able to trace it by its number; that Cardinelli insisted on having two shares of the spoils because he had made all the arrangements, and that they all agreed; that the six men left in couples, two going in the car and the other two couples walking in opposite directions to Bowman's place; that when witness and his companion reached Canal street he saw Crapo and his companion coming out of an alley

onto the street; that in a few minutes he saw Viana and Orlando coming in the car; that Orlando stayed in the car and the other five went into Bowman's saloon. His description of what took place in the saloon is substantially the same as the description given by Mrs. Bowman. He testified further that after the shooting was over they all ran and jumped into the car; that Orlando asked one of the strangers if he got the money, and he replied, "Never mind; drive ahead; I got the customer;" that they drove south on Canal street, and at Twenty-fifth street Viana, Crapo and witness got out of the car so that the overloaded machine would not attract attention; that witness took a street car and went home; that on Saturday he saw Cardinelli, who said to him, "You got the money and you double-crossed the guys on the north side, and when they see you they are going to bump you off;" that Cardinelli told him that he would have to get some money to help Orlando out of town, because the police had taken Orlando's car and would arrest him and then he would turn State's evidence; that witness told Cardinelli he had no money and knew of no place where he could get it; that Cardinelli suggested that he rob a carpenter who kept a shop near by; that the following Saturday he saw Cardinelli again; that in the meantime Orlando had been shot and they talked about this, Cardinelli again warning the witness about what happened to "squawkers." On cross-examination he testified that he was sentenced to hang for the Kubalanza murder on June 18, 1920; that he talked with the prosecutor some time before the date set for his execution; that his attorney was present and they discussed the proposition of his testifying against Sam Cardinelli; that the prosecutor promised to recommend to the Governor that his sentence be commuted to life imprisonment if he would testify against Cardinelli. After this conversation he was brought into court and the date of his execution was advanced to October.

The court called Viana and Crapo and permitted the
attorneys for the People and for the defendant to cross-
examine them.   Their testimony was substantially the same
as that given by Errico.   When first on the stand Crapo
insisted that Cardinelli had nothing to do with planning the
murder, but on the last day of the trial he sent word to
the court that he wanted to be recalled and to correct some
of his statements.   The court conferred with counsel and
they all stated they did not desire to request the court to
recall Crapo but that they would have no objection to the
court's recalling him if the court desired.   The court re-
called Crapo, who testified that he had decided he had been
"playing the goat too long" and that he wanted to change
his testimony.   He then testified that he had agreed with
Errico and Viana to rob Bowman, and that he met Or-
lando and his companions in Cardinelli's poolroom Tues-
day afternoon; that Cardinelli introduced the men to the
witness and they all discussed the plans in the room back
of the poolroom.   His story of the robbery is substantially
the same as that of the other witnesses.   He testified fur-
ther that when he and Viana left the automobile at Twenty-
fifth street they went down to the lake and stayed there
for about three weeks; that in the meantime they went
to see Cardinelli, entering his poolroom through the back
door; that Cardinelli told them that according to the news-
papers $2500 was taken and that the other parties were ac-
cusing witness, Errico and Viana of double-crossing 'them;
that Cardinelli said the north side men would kill them if
they found them and that they had better get some money
and straighten things up; that he told them Orlando's
car had been taken, and that he had to dress Orlando in
women's clothes to get him out of town so that the police
would not get him; that he said it had cost him $175 and
that they must get some money to help pay this expense;
that he said there was a carpenter who lived near by who
had over $500 in his possession and that they could get

that; that they went to the carpenter's shop and looked it over but thought they could not make a successful job of the robbery and gave it up. He explained that his failure to testify truthfully the first time he was on the stand was due to his fear that his parents might be injured on account of his testifying against Cardinelli.

Sam Cardinelli testified in his own behalf that he knew Crapo, Errico and Viana and that they had been in his poolroom a few times; that he saw them there June 24, 1919, and saw four other men drive up in an automobile in front of his place; that they arrived about 3:30 o'clock in the afternoon, came into his poolroom, got cigars and then went to the back room; that about twenty minutes later he heard some noise coming from there and went back and found that they had a bottle of whisky and that they had dropped a gun on the floor; that he told them he would not allow them to bring whisky there, and that then they all left the poolroom, got into their machine and drove away; that Errico came back to his place about eight o'clock that night and asked him if he had heard what they were talking about in the back room that afternoon; that he said he had not, and that Errico said, "If you did hear anything you had better keep your mouth shut," and if he did not he would cut his throat; that Orlando came to his place the next day and asked where the people were who had been there the day before, and that he told him he did not know; that Orlando claimed that they had gotten the money and that if they did not give him his part he would kill them all; that Orlando told him that the police came and took his machine and that he had to leave town and needed some money; that he saw Viana two or three days after the robbery and that Viana inquired if anyone had been there; that he told Viana that Orlando had been there and that he wanted his money; that Viana said he did not get the money; that he saw Errico about a month later, and that Errico told him to keep his mouth

shut or he would kill him the same as he had been killing other people. He denied he had ever been in Bowman's saloon. He claimed that his business had been largely with Italians and Sicilians and that he could not speak and understand the English language. He denied that he conducted headquarters for highwaymen and denied that he kept guns in his place of business. He also denied that Crapo, Viana, Errico and others frequented his place, and he stated that they had been there but a few times and that he had ordered them to stay away.

Several police officers testified that they had seen Crapo, Errico, Viana, and others of the same type, about the place of Cardinelli; that they knew Cardinelli's general reputation for veracity and that it was bad. The defense offered no evidence to rebut this reputation testimony, and there was no evidence offered regarding the general reputation of Cardinelli as a peaceable and law-abiding citizen.

Police officers Norton, Carroll, Alcock and others testified to conversations had with Cardinelli which were largely a repetition of the statements of Viana, Errico and Crapo and Cardinelli's comment on the part of these statements that connected him with the Bowman murder. At first he denied any acquaintance with the young men and insisted that he had never seen them before. He was confronted with the three men, and they each told him that he knew them and that they had been in his poolroom, and each of them related his orders to them to rob the carpenter in order to get money with which to help Orlando get out of town. Cardinelli persisted in his denial of their statements and said they were lying about him. Later he qualified this denial by saying that he knew them; that they had been in his poolroom a few times; that he knew they were bad boys and had ordered them to stay away from his place. Later he admitted that they were in his place of business throughout the day of June 24, 1919, and that other men came to his place in the afternoon in an automobile and

that they had a conversation in his back room, and that the three strangers and Errico, Crapo and Viana left about 4:30 P. M. At first he denied any acquaintance with Orlando but later admitted that he knew him.

The officers were permitted to relate in detail these several conferences with Cardinelli, and his counsel argue with much force that reversible error was committed when this line of testimony was admitted. It has long been the settled law in this State that the confession of one co-defendant cannot be admitted against another unless made in the presence of the other co-defendant and assented to by him. (*People* v. *Buckminster,* 274 Ill. 435.) The principle upon which statements made in the presence of one accused of crime are admitted in evidence against him is, that his silence when he might and naturally would deny the accusations of guilt if they were untrue is regarded as an acquiescence of their truth and an implied admission of guilt. Where the incriminating statements or accusations are denied *in toto* by the accused there can be no implied admission of his guilt and such statements are wholly inadmissible against him, (*People* v. *Schallman,* 273 Ill. 564,) but if he makes a reply admitting the truth of the statements wholly or in part, both the statements and the reply are competent evidence. If any part of a conversation with the defendant tends to show directly or indirectly that he is guilty of the crime charged, then the conversation is admissible and both parties are entitled to have put in evidence all that was said at the time. (*People* v. *Harrison,* 261 Ill. 517; *Commonwealth* v. *Trefethen,* 157 Mass. 180, 31 N. E. 961.) Cardinelli finally admitted the truth of practically all the statements of his co-defendants. At first he denied many facts which were relevant to the issue and it was proper for this information to go to the jury. Some of the evidence recited was competent on the ground that the conduct or replies of Cardinelli, in view of the statements made to him, had some tendency to show guilt on

his part. It was certainly competent to show that Cardinelli denied all acquaintance with Errico, Crapo, Viana and Orlando and denied all knowledge of the trio meeting Orlando or his companions at his poolroom on the day of the Bowman murder. Many of the details of these conferences with Cardinelli were not admissible, but there was no proper objection to the testimony and the question is not preserved for review. The only attempt to save the question was by the following motion made at the close of Norton's testimony: "I move to strike all the testimony of the witness Norton pertaining to any of the conversations that he testified were by Crapo, Errico and Viana, on the ground that they were confessions of the defendants and that they were denied by the defendant Cardinelli, and are in no sense binding upon him." The court ruled that Cardinelli had not denied all the statements and denied the motion to strike. The objectionable part of the testimony was not pointed out in the motion but the motion was to strike the whole testimony. The court did not err in overruling the motion. *People* v. *Walczniak,* 273 Ill. 76; *People* v. *Bopp,* 285 id. 396.

It is further urged that the court erred in calling and examining Viana and Crapo. It is true that the trial judge ought to exercise his right to call and examine a witness with great care, and that he should not adopt the practice except where it is shown that otherwise there may be a miscarriage of justice. (*People* v. *Bernstein,* 250 Ill. 63.) Where the State's attorney knows that a witness was present at the scene of a killing, but for some reason, either because he has no confidence in the witness or for any other good reason, he may doubt the veracity or integrity of the witness, he is not obliged to call such witness. In such case the court may call the witness and leave him open for cross-examination by either side. (*Carle* v. *People,* 200 Ill. 494.) Where the witness is jointly indicted with the defendant on trial but is not on trial, and his testimony

is deemed necessary to prevent a miscarriage of justice, it is not improper for the court to call and examine him. (*People* v. *Curran,* 286 Ill. 302.)    Viana was under sentence of death for another murder, and the State's attorney was certainly in no position to vouch for his testimony. When first arraigned Crapo pleaded not guilty, and the trial started with both Crapo and Cardinelli as defendants.    During the progress of selecting the jury Crapo withdrew his plea of not guilty and entered his plea of guilty.    That panel of jurors was excused and a new panel was called and the trial of Cardinelli proceeded.    Under those circumstances, and especially in view of the character of testimony given by Crapo, we hold the court was clearly justified in calling and examining the witnesses.

Complaint is also made of the cross-examination of several of the witnesses by the State's attorney.    Much of his cross-examination of Viana and Crapo was uncalled for and was unfair to the defendant.    With a professed purpose of impeaching the witnesses he examined them in great detail concerning matters stated by them in their formal statements to the police.    Great stress was laid on Cardinelli's suggestion that they rob the carpenter, and his instructions to them to stick a knife in his stomach and twist it around if he offered resistance were detailed in several questions.    Whatever the purpose of this cross-examination, the natural result would be prejudice to the defendant, and the court on its own motion should have stopped it.    No proper objection was made to the testimony, and in view of the record the error was not sufficient to justify a reversal of the judgment.    We see nothing objectionable in the cross-examination of Cardinelli.

During the cross-examination of witness Loewe the State's attorney asked him how many times he had been in jail and if he had ever pleaded guilty to highway robbery.    It was improper for the State's attorney to ask these questions and the court properly sustained objections to

them. This would not have cured the error if the record did not properly show that the witness had shortly before entered his plea of guilty to a charge of burglary and had been released on probation. He was properly impeached by this record of conviction, (*People* v. *Andrae*, 295 Ill. 445,) and the improper cross-examination did not prejudice the cause of Cardinelli.

We have considered all the errors assigned and find the record free from reversible error. An examination of the evidence so clearly and conclusively establishes the guilt of the accused that the jury could not reasonably have arrived at any other verdict than one of guilty. As we have said, this record is not free from error. The purpose of a reviewing court, however, is not to determine whether the record is perfect, but its purpose is to determine whether defendant has had a fair trial under the law and whether his conviction is based on evidence establishing his guilt beyond all reasonable doubt. Where it can be said from the record that an error complained of could not reasonably have affected the result of the trial the judgment of the trial court should be affirmed. *People* v. *Cleminson,* 250 Ill. 135; *People* v. *Halpin,* 276 id. 363; *People* v. *Haensel,* 293 id. 33.

The judgment of the criminal court of Cook county is affirmed. The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of April 15, 1921, as the time when the original sentence of death delivered in the criminal court of Cook county shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of Cook.

*Judgment affirmed.*