Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/26/2023 09:08 AM CDT

State of Nebraska, appellee, v.
Karl J. Dailey, appellant.

___ N.W.2d ___

Filed May 26, 2023.    No. S-22-102.

1. **Courts: Appeal and Error.** Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.

2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Appeal and Error.** An appellate court independently reviews questions of law in appeals from the county court.

4. **Convictions: Appeal and Error.** In an appeal of a criminal conviction, an appellate court reviews the evidence in a light most favorable to the prosecution.

5. **Administrative Law: Statutes: Appeal and Error.** The meaning and interpretation of statutes and regulations are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

6. **Statutes.** Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

7. **Statutes: Legislature.** It is a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time the Legislature enacted the statute.

8. **Appeal and Error: Words and Phrases.** Appellate courts often turn to dictionaries to ascertain a word's plain and ordinary meaning.

9. **Administrative Law.** An administrative agency is limited in its rulemaking authority to powers granted to the agency by the statutes which it is to administer. It may not employ its rulemaking power to modify, alter, or enlarge portions of its enabling statute.

10. ___. An administrative agency cannot employ its rulemaking authority to adopt regulations contrary to the statutes that it is empowered to enforce.

11. **Appeal and Error.** Alleged errors of the lower court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court.

Appeal from the District Court for Dawes County, Derek C. Weimer, Judge, on appeal thereto from the County Court for Dawes County, Randin R. Roland, Judge. Judgment of District Court affirmed.

Charles D. Brewster and Carson K. Messersmith, of Anderson, Klein, Brewster & Brandt, for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Pankonin, District Judge.

Funke, J.

## INTRODUCTION

Karl J. Dailey, the sheriff of Dawes County, Nebraska, challenges his conviction for official misconduct, in violation of Neb. Rev. Stat. § 28-924 (Reissue 2016), for failing to receive a lawfully committed prisoner into the county jail. The prisoner was arrested without a warrant for felony offenses. Dailey argued that the prisoner was not lawfully committed to a jail for purposes of Neb. Rev. Stat. § 23-1703 (Reissue 2022), because no court order directed the prisoner to jail. Dailey also argued that he had discretion under Nebraska's jail standards (Jail Standards) as to whether to receive the prisoner. The district court for Dawes County rejected those arguments when it affirmed Dailey's conviction and sentence from the county court. Finding no error, we affirm.

## BACKGROUND

On July 21, 2019, multiple law enforcement officers in Dawes County were involved in a search for Jesse Sierra. Sierra had previously been identified as a person of interest in an alert about his missing girlfriend. Sierra's girlfriend arrived at a hospital in Chadron, Nebraska, on July 21, claiming that Sierra assaulted her at a motel in Crawford, Nebraska. Both Chadron and Crawford are located in Dawes County.

Upon learning that Sierra's girlfriend was at the hospital, the Chadron Police Department (CPD) reached out to the Nebraska State Patrol (NSP) and the Dawes County sheriff's office, but did not directly contact Dailey. Dailey learned of the search and called an NSP commander to convey that he "was unhappy [with] how things were unfolding." According to the commander, Dailey believed that the NSP should have checked with him to make sure it was "okay . . . to be assisting the [CPD] in Crawford."

Dailey went to the motel in Crawford where Sierra's girlfriend was reportedly assaulted and spoke with an NSP lieutenant, as well as with NSP Trooper Jared Dusatko. Dailey told the NSP officers that "you can expect zero cooperation from me and my people in the future." Dailey also said that "[i]f I can arrange it, you won't be booking prisoners in my jail anymore; you can take them all the way to Scotts Bluff from now on."

Meanwhile, CPD Officer Sean Considine located Sierra in Chadron. Sierra had a "minor abrasion" on his face and was limping. Sierra claimed that he had been run over by a vehicle. Medics spoke with Sierra onsite, and he was then transported, by Considine, to the hospital in Chadron due to his claimed injuries.

Dailey came to the scene of Sierra's arrest while Sierra was still present in Considine's patrol vehicle. Dailey spoke with Considine about Sierra's medical issues and told Considine to "[s]end [Sierra] to Scotts Bluff where they have medical care."

Sierra was examined at the hospital, but was not admitted. He left the hospital in Dusatko's custody. When they left, Dusatko had a clear impression that "Dawes County was not going to take [Sierra]," based on Dailey's comments at the motel in Crawford and the information relayed by Considine. The NSP's dispatch center also advised Dusatko that the Dawes County jail would not take Sierra, based upon a conversation that the dispatcher had with Dawes County jail staff wherein the dispatcher asked whether the jail would take Sierra "if he has a medical clearance." Jail staff replied that "[they] were told by the sheriff to not take [Sierra]." However, Dusatko never physically presented Sierra at the Dawes County jail.

Dusatko called the Box Butte County jail and asked whether it would take Sierra. The staff declined, for reasons that Dusatko could not recall at trial. Sheridan County jail staff also declined to take Sierra. Dusatko then transported Sierra approximately 100 miles to the Scotts Bluff County jail.

On July 21, 2019, the Dawes County jail had seven to nine prisoners, and two staff members were on duty. The staff had no medical training, and there were no medical resources onsite. The cell normally used to hold prisoners like Sierra was under construction, although it could potentially still have been "available." It is undisputed that no court order then directed Sierra to jail.

During the NSP's subsequent investigation of these events, Dailey admitted that he was "abusive" toward the NSP officers because he was upset. He indicated that the jail refused Sierra because Sierra was injured. However, Dailey also made comments to the effect that the jail technically should have accepted Sierra and then transported him to another jail, if necessary, but did not do so because of Dailey's frustration with the CPD and NSP.

Thereafter, Dailey was charged in the county court with official misconduct for refusing to receive Sierra. Dailey moved to quash the criminal complaint against him on the

grounds that sheriffs in Nebraska have discretion as to whether to receive prisoners under the Jail Standards. That motion was overruled.

## County Court Proceedings

A bench trial was held in the county court for Dawes County. At trial, the State presented testimony from six witnesses. Their testimony, as relevant to the present appeal, is summarized below. The CPD chief testified that he was aware of "one or two other times" when Dawes County jail staff declined to receive a prisoner. However, he viewed those situations as different, because the jail had been full or did not yet accept women. Although the NSP lieutenant testified that he had not previously been asked for a medical clearance for a prisoner, Considine and Dusatko testified that such forms are standard with prisoners with medical issues. The CPD chief, the NSP lieutenant, and Dusatko all testified that they were not given a reason why the Dawes County jail did not receive Sierra.

After the State rested, Dailey moved for dismissal, claiming that the State had failed to prove that Sierra was lawfully committed to jail. The State countered that the plain meaning of "lawfully committed" includes persons arrested without a warrant. The State also argued that § 23-1703 must be read together with the Nebraska statutes authorizing warrantless arrests because it would make no sense to allow arrests without a warrant if officers had no place where they could house arrestees. The county court agreed with the State, construing § 23-1703 to require jails to receive persons lawfully arrested without a warrant.

Dailey then presented testimony from his four witnesses. Their testimony, as relevant to this appeal, is summarized below. A Dawes County jail supervisor testified that he was not aware of another inmate who was denied admission for medical reasons and that the jail had housed a murder suspect in the past. An inspector for the Jail Standards division of

the Nebraska Commission on Law Enforcement and Criminal Justice testified that it would not have been "advisable" for the jail to house a prisoner with "some head injuries, contusions, . . . and a leg injury." The inspector also testified that the jail should house high-risk prisoners, like Sierra, only if there were no other male prisoners and the jail was fully staffed. According to the inspector, the Jail Standards permit jails to "reject" prisoners "back into the custody of the arresting agency" if the jail staff believes immediate medical attention is necessary. The inspector further testified that jails may also "refuse" prisoners who are fit for confinement and that "sheriffs decline admissions . . . frequently because they just can't house that type of prisoner." The sheriff of Box Butte County testified similarly that she does not receive "any and all arrestees" and had previously rejected prisoners on medical and other grounds.

The county court found Dailey guilty. In so doing, it rejected Dailey's argument that there must be "some type of court order" for a person to be lawfully committed. It also found that Dailey's argument that he could not accept Sierra due to Sierra's medical condition and high-risk status was inconsistent with the evidence. The county court observed that Dailey stated that the jail would not accept Sierra before he ever saw Sierra and before Sierra was medically examined. The county court observed that Dailey subsequently told investigators that he acted out of anger over the situation with Sierra.

Dailey was subsequently sentenced to a fine of $750.

### District Court Proceedings

Dailey appealed to the district court for Dawes County, which affirmed his conviction. The district court found that Sierra was lawfully arrested and detained and, as such, had been lawfully committed to the jail. The district court also found that the Jail Standards cannot override statutory requirements and that Dailey did not actually state any concerns based on the Jail Standards when refusing to receive Sierra.

Instead, the district court found that Dailey was "upset" that he was not personally involved in the search for Sierra and "decided to flex his authority."

Dailey appealed to the Nebraska Court of Appeals, and we moved the matter to our docket. Following oral arguments, we requested supplemental briefing from the parties as to whether a prisoner must be physically presented to the jail and denied admission for a sheriff to be convicted of official misconduct for failing to receive a prisoner in violation of § 23-1703.

## ASSIGNMENTS OF ERROR

Dailey assigns, restated, that the county court erred in finding that (1) the evidence was sufficient to find him guilty, (2) law enforcement officers making an arrest have the authority to lawfully commit the arrestee to jail, (3) Sierra was required to be admitted to jail under § 23-1703, (4) a court order is not required for lawful commitment to jail under § 23-1703, (5) Dailey violated § 23-1703 when there was no evidence that Sierra was presented at the jail after being medically cleared, and (6) Sierra could not be denied admission due to his injuries and high-risk status. Dailey also assigns that the district court erred in affirming the county court's judgment. However, his arguments on appeal, restated, are that persons lawfully arrested without a warrant are not lawfully committed to jail, the Jail Standards authorized Sierra's exclusion from jail, and sheriffs in Nebraska have inherent authority to decline to admit arrestees.

## STANDARD OF REVIEW

[1-3] Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.[1] When reviewing a judgment for errors appearing on the record, an appellate court's inquiry

---

[1] *Scalise v. Davis*, 312 Neb. 518, 980 N.W.2d 27 (2022).

is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2] However, an appellate court independently reviews questions of law in appeals from the county court.[3]

[4] In an appeal of a criminal conviction, we review the evidence in a light most favorable to the prosecution.[4]

[5] The meaning and interpretation of statutes and regulations are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[5]

## ANALYSIS

### Interpretation of § 23-1703

Dailey argues that he cannot be found guilty of official misconduct for failing to receive Sierra because there was no "court order, mittimus, or even a warrant" directing Sierra to jail and because, as such, Sierra was not "'lawfully committed'" for purposes of § 23-1703.[6] The State counters that the plain meaning of "lawful commitment" does not require a court order. The State also argues that § 23-1703's provisions regarding the duties of sheriffs must be construed in conjunction with other Nebraska statutes authorizing warrantless arrests. We agree with the State.

We first note that under the plain language of § 28-924(1), a "public servant commits official misconduct if he knowingly violates any statute or lawfully adopted rule or regulation relating to his official duties." Neither party disputes

---

[2] *Id.*

[3] *Id.*

[4] *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022).

[5] *REO Enters. v. Village of Dorchester*, 312 Neb. 792, 981 N.W.2d 254 (2022).

[6] Brief for appellant at 13.

that Dailey, as the sheriff of Dawes County, was a public servant. As such, we focus our attention on whether Dailey violated § 23-1703 by failing to receive Sierra as a lawfully committed prisoner.

[6,7] To do so, we turn to the plain language of § 23-1703, which was enacted in 1879 and has not been amended in relevant part since then. Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.[7] It is a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time the Legislature enacted the statute.[8]

[8] We often turn to dictionaries to ascertain a word's plain and ordinary meaning.[9] In this case, in 1879, dictionaries generally defined "commit" to mean "impri[s]on" or "[s]end to pri[s]on" and defined "commitment" to mean the "[a]ct of" committing or an "order for" committing a person.[10] "Lawful" and "lawfully" were defined to mean that which conforms to law and may be described as just, right, and proper.[11] Some dictionaries suggested that commitment "ought generally to be made by Warrant"[12] or that commitment "in *writing* seems more necessary than formerly" due to habeas concerns.[13] However, those statements, when they appeared, did not purport to exclude persons arrested without a warrant from among those who were seen to be committed.

---

[7] *State v. Space*, 312 Neb. 456, 980 N.W.2d 1 (2022).

[8] *State v. Godek*, 312 Neb. 1004, 981 N.W.2d 810 (2022).

[9] *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

[10] See, e.g., John Walker, Critical Pronouncing Dictionary, and Expositor of the English Language (1803) (unpaginated). Accord Noah Webster, Compendious Dictionary of the English Language 58 (1806).

[11] Webster, *supra* note 10; Walker, *supra* note 10.

[12] Giles Jacob, A New Law-Dictionary (1729) (unpaginated).

[13] 1 Giles Jacob & Thomas Edlyne Tomlins, The Law-Dictionary: Explaining the Rise, Progress, and Present State, of the English Law 508 (1811).

Such definitions were arguably consistent with the common law as to both warrantless arrests and the duties of sheriffs. At common law, "sheriffs, justices of the peace, coroners, constables and watchmen were entrusted with special powers as conservators of the peace."[14] Among their powers was the authority to make arrests without a warrant for felonies and for misdemeanors involving a breach of the peace committed in their presence.[15] Sheriffs, in turn, had among their duties "commit[ting] to jail all felons, traitors, and other misdoers."[16] Following an arrest, it was the sheriff's duty to "confine in jail and safely keep all persons in his custody . . . until lawfully discharged, and, if they escape, to pursue and recapture them."[17] Sheriffs were liable if they failed to take proper precautions to protect their prisoners or if their prisoners escaped or were unlawfully released.[18] For example, in an 1868 decision, the Alabama Supreme Court affirmed the conviction of a special sheriff's deputy who allowed a prisoner to escape.[19] A federal court took a similar view in 1894, allowing recovery on a sheriff's bond for the expenses of recovering an escaped prisoner.[20]

---

[14] 2 Ruling Case Law § 3 at 446 (William M. McKinney & Burdett A. Rich eds., 1914).

[15] *Id*. See, also, *Diers v. Mallon*, 46 Neb. 121, 126, 64 N.W. 722, 723 (1895) (sheriffs, constables, and peace officers may make warrantless arrests for felony offenses "in the absence of any express statutory provision"); *Simmerman v. State*, 16 Neb. 615, 21 N.W. 387 (1884) (persons who are not officers had statutory authority to make certain warrantless arrests).

[16] 24 Ruling Case Law § 6 at 916 (William M. McKinney & Burdett A. Rich, eds., 1919).

[17] *Id*. at 923.

[18] *Id*.

[19] *Kavanaugh v. The State*, 41 Ala. 399 (1868), *overruled on other grounds, Andrews v. The State*, 78 Ala. 483 (1885).

[20] *State of Tennessee v. Hill*, 60 F. 1005 (1894).

There appear to be fewer cases addressing a sheriff's failure to receive a lawfully committed arrestee. However, in an 1822 opinion, the Pennsylvania Supreme Court affirmed the conviction of a "keeper of the [Philadelphia] prison" for refusing to receive a prisoner whom a city constable arrested without a warrant for "committing a breach of the peace in [the constable's] presence."[21] That court found that the jailer was "bound to receive a prisoner offered by a constable for safe keeping."[22] In so doing, the court observed that a constable is "a known officer, charged with the conservation of the peace, and whose business it is to arrest those who have violated it."[23] The court further observed that it would be "strange" if private persons had to obey and assist constables in suppressing breaches of the peace, but "an officer of justice should be at liberty to refuse the most efficient assistance of all, the confinement of the parties engaged."[24] The court concluded that "officers of justice are bound to assist each other in their several departments, and to afford each other all the facilities which the public means have put in their power."[25]

Subsequently, in a 1901 opinion, the Vermont Supreme Court similarly stated that "the right to commit to jail follows the right to arrest, with the limitation however that the officer should, as soon as circumstances will reasonably permit, bring his prisoner before a proper magistrate for a preliminary examination."[26] In that case, a prisoner who killed a deputy after escaping from jail defended himself by arguing that his initial imprisonment was unlawful because there was no

---

[21] *The Commonwealth v. Deacon*, 8 Serg. & Rawle 47, 47 (Pa. 1822).

[22] *Id*. at 48.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *State v. Shaw*, 73 Vt. 149, 169-70, 50 A. 863, 869 (1901).

mittimus committing him to jail and that thus, he committed no crime in escaping. The court disagreed, finding that a mittimus or court order expressly committing prisoners to jail was "not essential to their legal commitment to jail."[27] The court observed that a sheriff has a duty to take charge of "persons before the court accused of crime"; otherwise, such persons would be "in the custody of no one, and . . . at liberty to go whither [they] will."[28] The court reasoned that once the accused was in legal custody, "the sheriff as executive officer was charged with his safekeeping."[29]

In light of the plain meaning of "lawfully committed" in 1879 and the common law regarding warrantless arrests and the duties of sheriffs, we reject Dailey's argument that a court order, mittimus, or warrant is required for a prisoner to be lawfully committed to jail under § 23-1703. Instead, we find that prisoners like Sierra, lawfully arrested without a warrant on felony charges, are lawfully committed for purposes of § 23-1703.

Nor are we alone in taking such a view of statutory language codifying the common-law duties of sheriffs. Other states have adopted statutes like § 23-1703,[30] and the attorneys general of those states have also opined that persons lawfully arrested

---

[27] *Id*. at 165, 50 A. at 868.

[28] *Id*.

[29] *Id*. at 166, 50 A. at 868.

[30] See, e.g., Ala. Code § 14-6-5 (2018); Ark. Code Ann. § 12-41-503(b) (Supp. 2009); Colo. Rev. Stat. Ann. § 17-26-103 (West 2020); Iowa Code Ann. § 356.2 (West 2013); Kan. Stat. Ann. § 19-1930(a) (2007); Ky. Rev. Stat. Ann. § 71.040 (LexisNexis 2014); Mass. Gen. Laws Ann. ch. 126, § 16 (West 2015); Mich. Comp. Laws Ann. § 66.8 (West 2006); Minn. Stat. § 387.11 (2022); Miss. Code Ann. § 19-25-35 (2012); Mo. Ann. Stat. § 57.100(1) (West 2023); Nev. Rev. Stat. § 248.050 (2021); N.J. Stat. Ann. § 30:8-17 (West 2020); Or. Rev. Stat. § 169.320(1) (2007); S.C. Code Ann. § 24-5-10 (2007); Tenn. Code Ann. § 8-8-201(a)(3) (Supp. 2009); Va. Code Ann. § 18.2-476 (2004); W. Va. Code Ann. § 7-8-4 (LexisNexis 2006).

without a warrant are lawfully committed to jail under their states' statutes.[31]

For example, in 1989, the Iowa Attorney General took the view that "actual commitment or conviction" is not required for a person to be lawfully committed to jail under that state's statute.[32] Instead, there need only be an arrest for an offense for which the arrestee could be imprisoned if convicted.[33] In reaching that conclusion, the Iowa Attorney General observed that law enforcement officers have statutory authority to make warrantless arrests. Accordingly, the Iowa Attorney General reasoned that construing "lawfully committed" narrowly to mean commitment by a court would be contrary to the Legislature's intent in enacting those statutes, because it "would obviously hamper law enforcement efforts."[34] The Tennessee Attorney General took a similar view in a 1994 opinion, finding that the term "commitment" was not limited to "formal commitment"; rather, it encompassed any lawful holding, and he found a "temporary holding" after an arrest and prior to an individual's appearance before a magistrate to be lawful.[35]

---

[31] See, e.g., Wash. Att'y Gen. Op. No. 4 (Dec. 23, 2004); Tenn. Att'y Gen. Op. No. 02-015 (Feb. 6, 2002); Tenn. Att'y Gen. Op. No. 98-159 (Aug. 24, 1998); Tenn. Att'y Gen. Op. No. 94-041 (Mar. 31, 1994); Iowa Att'y Gen. Op. No. 89-7-1 (July 3, 1989); Wash. Att'y Gen. Op. No. 9 (May 9, 1988); Iowa Att'y Gen. Op. No. 82-6-9 (June 17, 1982); Ky. Att'y Gen. Op. No. 81-148 (Apr. 8, 1981); Wash. Att'y Gen. Op. No. 21 (Nov. 13, 1980); Ky. Att'y Gen. Op. No. 72-780 (Nov. 28, 1972); Ohio Att'y Gen. Op. No. 972 (Sept. 8, 1927). But see, Tenn. Att'y Gen. Op. No. 89-23 (Feb. 13, 1989) (pretrial divertees not lawfully committed to jail because housing them there is inconsistent with purpose of pretrial diversion); Ind. Att'y Gen. Op. 34, 35 (May 20, 1903) ("tramps" who are picked up without having committed crime and are not charged with one are not "lawfully committed" to jail).

[32] Iowa Att'y Gen. Op. No. 89-7-1, *supra* note 31 at 33.

[33] *Id*.

[34] *Id*. at 32.

[35] Tenn. Att'y Gen. Op. No. 94-041, *supra* note 31 at 3.

The various sources cited by Dailey in support of his argument that a court order is required for a prisoner to be lawfully committed to jail are inapposite. For example, Dailey quotes the following definition of "commitment" from the fourth edition of Black's Law Dictionary:

> In practice. The warrant or *mittimus* by which a court or magistrate directs an officer to take a person to prison. Authority for holding in prison one convicted of crime. . . . A process directed to a ministerial officer by which a person is to be confined in prison, usually issued by a court or magistrate. . . .
>
> . . . .
>
> The act of sending a person to prison by means of such a warrant or order.[36]

However, even assuming that that definition, which was drafted after the enactment of § 23-1703 and addresses the noun "commitment" rather than the verb "commit," were seen to be applicable, it would not support Dailey's argument.[37] Instead, that definition itself says only that the commitment process is "usually" directed by a court or magistrate. The definition also encompasses any authority for confining a prisoner or any process by which a prisoner is confined.

The same is generally true of the opinions from this and other jurisdictions cited by Dailey. Those opinions sometimes include statements to the effect that a "commitment is a warrant, order[,] or process by which a court or magistrate directs a ministerial officer to take a person to prison or to detain

---

[36] Black's Law Dictionary 341 (4th ed. 1951).

[37] Cf. Black's Law Dictionary 329 (10th ed. 2014) (defining "commit" to mean "[t]o send . . . to prison or to a mental health facility, esp. by court order," and "commitment" to include both act of confinement to "prison, mental hospital, or . . . institution" and "order directing" such confinement).

him there."[38] However, in all but one instance, those cases did not purport to address whether lawful commitment could result from a warrantless arrest.[39]

The one exception is a 1912 opinion from the Vermont Supreme Court, which expressly stated that detention following a legal arrest, "by virtue of either civil or criminal process, or without process," pending a court hearing does not constitute a commitment to jail.[40] However, the court there made clear that it was concerned with a specific statute, requiring those under age 16 committed to jail to be kept separate from older persons, that "refers to commitments in the strict sense."[41]

Nor do we find persuasive the dissent's suggestion that a prisoner must be physically presented at a jail for a sheriff to be found to have failed to "receive" the prisoner for purposes of § 23-1703. The plain meaning of the term "receive" is "to take, get, admit, hold, entertain."[42] Nothing in that definition, or in the language of § 23-1703, requires that a prisoner be physically present at the jail for the sheriff to be found to have refused to receive the prisoner. And, viewing the evidence in the light most favorable to the conviction, as our standard of review requires, we believe there was competent

---

[38] *People ex rel. Allen v. Hagan*, 170 N.Y. 46, 49, 62 N.E. 1086, 1087 (1902), *distinguished on other grounds, In re Joerns*, 100 N.Y.S. 503, 51 Misc. 395 (1906).

[39] Cf., *State, ex rel. Marasco, v. Mundell*, 127 Neb. 673, 256 N.W. 519 (1934); *Cain v. Miller*, 109 Neb. 441, 191 N.W. 704 (1922); *Huffman v. Koppelkom*, 8 Neb. 344, 1 N.W. 243 (1879). See, also, *Gilbert v. United States*, 23 Ct. Cl. 218 (1888); *People v. Henderson*, 235 N.Y.S. 173, 134 Misc. 228 (1929); *People ex rel. Allen v. Hagan, supra* note 38.

[40] *In re Liola Edson*, 85 Vt. 366, 369, 82 A. 664, 665 (1912).

[41] *Id.*

[42] Webster, *supra* note 10 at 249. See, also, Black's Law Dictionary, *supra* note 37 at 1460 ("receive" means "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source").

evidence that Dailey refused to receive Sierra. As recounted above, there was evidence that Dailey emphasized on numerous occasions that he would not accept Sierra as a prisoner, as well as evidence that when an NSP dispatcher asked jail staff whether they would take Sierra "if he has a medical clearance," jail staff replied that they had been instructed by Dailey not to take Sierra.

### Authority Under Nebraska's Jail Standards

Dailey also argues that he had authority under the Jail Standards to decline to receive Sierra, because Sierra was injured and a high-risk prisoner. The State counters that the decision not to receive Sierra was not actually based on the Jail Standards and that Dailey failed to "discuss or even recite any provisions" of the Jail Standards that would support his position.[43] We again agree with the State.

Dailey does not specifically cite the standard or standards that he claims authorized his actions; instead, he relies on testimony by an inspector for the Jail Standards division of the Nebraska Commission on Law Enforcement and Criminal Justice. However, even if Dailey could point to a specific standard authorizing him to decline to receive Sierra, his argument would be unavailing, because the trier of fact found that Dailey's claim that the decision not to receive Sierra was based on the Jail Standards was not credible in light of the evidence presented. The county court observed that Dailey told the NSP that the jail would not receive Sierra before Dailey ever saw Sierra and before Sierra was medically examined. The county court also pointed to Dailey's subsequent statement to investigators that he acted out of anger at the perceived slight to his authority. We defer to the county court's determinations about the credibility of witnesses and

---

[43] Brief for appellee at 20.

the weight of the evidence here; such matters are for the finder of fact. [44]

[9,10] Moreover, as regulations, the Jail Standards could not override a statutory requirement in any case. An administrative agency is limited in its rulemaking authority to powers granted to the agency by the statutes which it is to administer. [45] It may not employ its rulemaking power to modify, alter, or enlarge portions of its enabling statute. [46] An administrative agency cannot employ its rulemaking authority to adopt regulations contrary to the statutes that it is empowered to enforce. [47] Here, § 23-1703 expressly provides that sheriffs are "required to receive those lawfully committed and to keep them . . . until discharged by law." That statutory requirement cannot be altered by regulation.

## Inherent Authority

Dailey further argues that absent a court order, county sheriffs "by law" have discretion to determine who is admitted to jail, and that other law enforcement officers "do not, and should not, have the authority" to compel sheriffs to accept arrestees. [48] We disagree.

As the State observes, Dailey cites no authority for the proposition that absent a court order, sheriffs effectively have inherent authority to decline to receive arrestees. Nebraska statutes provide that sheriffs shall exercise the powers and perform the duties conferred and imposed upon them by other statutes and by the common law. [49] However, Dailey has not

---

[44] See, e.g., *State v. Garcia*, 311 Neb. 648, 974 N.W.2d 305 (2022).

[45] See, e.g., *Project Extra Mile v. Nebraska Liquor Control Comm.*, 283 Neb. 379, 810 N.W.2d 149 (2012), *overruled on other grounds, Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019).

[46] *Id*.

[47] *Id*.

[48] Brief for appellant at 19.

[49] Neb. Rev. Stat. § 23-1701.03 (Reissue 2022).

identified any Nebraska statute or provision of the common law authorizing sheriffs to decline to receive persons lawfully arrested. To the contrary, § 23-1703 expressly requires sheriffs to receive those lawfully committed, and the common law recognized both warrantless arrests and sheriffs' duties to receive lawful arrestees and maintain custody of them until their release.

## Remaining Assignments of Error

[11] Dailey assigned other errors in his brief on appeal. However, only those errors previously discussed were argued in Dailey's brief on appeal. As such, we decline to consider the remaining assignments of error. Alleged errors of the lower court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court.[50]

## CONCLUSION

Dailey's argument that the district court erred in affirming his conviction is without merit. Accordingly, we affirm the judgment of the district court, which affirmed Dailey's conviction and sentence from the county court.

Affirmed.

Freudenberg, J., not participating.

---

[50] *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022).

---

Heavican, C.J., concurring in part, and in part dissenting.

I concur in that portion of the majority's opinion which holds that prisoners who are lawfully arrested without a warrant on a felony charge are lawfully committed for purposes of Neb. Rev. Stat. § 23-1703 (Reissue 2022). I further concur with the majority's rejection of Dailey's assertion that sheriffs have discretion or inherent authority to determine who can be admitted to the jails they oversee. And I concur with the majority insofar as it concludes that Nebraska's

jail standards are regulations which cannot alter a statutory requirement. However, I respectfully dissent from that portion of the majority opinion affirming Dailey's conviction.

Dailey was charged with official misconduct under Neb. Rev. Stat. § 28-924 (Reissue 2016). Section 28-924 provides in part that "[a] public servant commits official misconduct if he knowingly violates any statute or lawfully adopted rule or regulation relating to his official duties." In this instance, Dailey was charged with not complying with the requirements of § 23-1703. Section 23-1703 provides:

> Except in counties where a county board of corrections exists and has assumed responsibility over the jail pursuant to sections 23-2801 to 23-2806, the sheriff shall have charge and custody of the jail, and the prisoners of the same, and is required to receive those lawfully committed and to keep them himself or herself, or by his or her deputy jailer, until discharged by law.

In order for Dailey to be convicted of official misconduct under § 28-924, the State has the burden to show that he failed to comply with his obligations under § 23-1703.[1] We have held that penal statutes must be strictly construed.[2] While I agree, as noted above, that Sierra was "lawfully committed," the State did not show that Dailey failed to "receive" Sierra.[3] The evidence is uncontroverted that Dusatko, a Nebraska State Patrol trooper, did not present Sierra at the Dawes County jail. Nor was evidence adduced that Dawes County jail staff declined to receive Sierra after he was medically cleared. Instead, Dusatko concluded, largely based upon Dailey's prior statements, that "Dawes County was not going to take [Sierra]."

---

[1] See *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017).

[2] *State v. Godek*, 312 Neb. 1004, 981 N.W.2d 810 (2022).

[3] See § 23-1703.

Even if I were to conclude that statements such as those made by Dailey might be sufficient in some situations to prove that a prisoner would not be received within the meaning of § 23-1703, and thus relieve the arresting officer of the requirement of presenting that prisoner, in my view, Dailey's statements here did not meet that threshold.

It is clear from the record that Dailey was upset with the State Patrol and how the investigation into Sierra's actions was proceeding. Indeed, the evidence is undisputed that Dailey indicated that the State Patrol could "expect zero cooperation" from the Dawes County sheriff's office "in the future" and that "if [Dailey] could arrange it, [the State Patrol] won't be booking prisoners in [the Dawes County] jail anymore." But these statements, as phrased, are divorced from the facts surrounding the Sierra investigation and were phrased as future actions.

In particular, the statement that Dailey hoped to "arrange it" so that he did not have to accept prisoners from the State Patrol suggests that Dailey understood that he might have to do so in this instance. And, the evidence showed that Sierra was in need of medical attention and that Dailey informed an officer with the Chadron Police Department that Sierra should be taken to the Scotts Bluff County jail because it had access to medical care and not for any other reason. There is no evidence that Dailey was informed that Sierra had been medically cleared and was ready to be received at the Dawes County jail.

While I agree with the majority that the Nebraska jail standards cannot alter a statutory requirement, I note that the record suggests that both Dailey and Dusatko were operating at least in part under the assumption that Sierra needed medical clearance to be admitted to the Dawes County jail.

In short, Dailey was not given the opportunity, upon Sierra's medical clearance at the hospital in Chadron, to decline to receive Sierra at the Dawes County jail. In the

absence of such a declination or refusal, we cannot find that the State met its burden to show that Dailey was guilty of official misconduct. The record shows that Dailey's conviction rests only on Dusatko's speculation that Dailey would fail to receive him. As such, I would reverse Dailey's conviction and remand the matter with instructions to dismiss the charge against him.

Pankonin, District Judge, joins.